[719 NYS2d 60]

N. X., Respondent-Appellant, v CABRINI MEDICAL CENTER, Appellant-Respondent, et al., Defendant.

First Department, January 18, 2001

## APPEARANCES OF COUNSEL

*Charles Palella* for respondent-appellant.

*Daniel S. Ratner* of counsel (*Daryl Paxson* on the brief; *Heidell, Pittoni, Murphy & Bach, L. L. P.,* attorneys), for appellant-respondent.

## OPINION OF THE COURT

FRIEDMAN, J.

The issue presented by this appeal is whether a hospital may be held liable for a sexual assault committed by a surgical resident either (a) because the assault is regarded as being within the scope of the resident's employment, or (b) because the hospital's nurses, who had no reason to know of the resident's deviant proclivities and were unaware that an assault was occurring, were in close proximity. In our view, settled principles of law preclude imposing tort liability upon the hospital for the unforeseeable crime committed by the resident. While plaintiff and the dissent invite us to depart from settled law and expand the outer limits of hospital liability, we decline the invitation.

This action arose on July 27, 1995, when plaintiff underwent a laser ablation of genital warts in the ambulatory surgical unit (ASU) at Cabrini Medical Center (Cabrini). An hour later, while she was still feeling the effects of anesthesia, she was transferred to the ASU's Phase 1 Recovery Room, which contained four stretchers. Nurse Imelda Reyes and a second nurse, whom she was training, checked plaintiff's vital signs. After about 10 minutes, the nurses turned their attention to a patient who had just been placed on another stretcher and were soon joined by Nursing Supervisor Linda Gamboa. Shortly thereafter, Nurse Reyes, who was standing with her back to

plaintiff's stretcher, peripherally saw a male physician, wearing hospital scrubs with a Cabrini logo and a Cabrini identification card, enter the ASU and walk to plaintiff's bed. Nurse Reyes did not see or hear anything while the doctor was at plaintiff's bedside.

According to plaintiff, she awoke to find defendant Dr. Favara pulling her hospital gown over her head and placing his hands between her thighs. He ordered her to open her legs and then placed his fingers inside her vagina and her anus. Plaintiff attempted to pull her gown down to cover her body and, after she asked Dr. Favara to stop three times, he walked away. Dr. Favara had not assisted in plaintiff's surgery and was not assigned to her.

In Nurse Reyes' estimation, Dr. Favara was in the ASU a total of one minute. As he was leaving, Nurse Reyes introduced herself to Dr. Favara, a surgical resident. Nurse Gamboa then joined them and introduced herself. It is uncontroverted that none of the nurses in the ASU was aware that Dr. Favara had just criminally assaulted plaintiff.

After Dr. Favara left, Nurse Reyes moved plaintiff to the Phase II area, following which plaintiff began to cry and told her about Dr. Favara's "examination." Nurse Gamboa was called, and she immediately asked Dr. Favara to return to the ASU. Under her questioning, he admitted he had performed, what he termed, a pelvic examination upon plaintiff and that he did so without a female witness present.

Nurse Gamboa notified Dr. LaRaja, who had performed plaintiff's surgery and who was also the director of surgery and of the surgical residency program. Within a few hours of the incident, Dr. LaRaja met with Dr. Favara and asked him why he had seen plaintiff in the ASU. Dr. Favara responded, "I really can't answer that." Dr. Favara was immediately suspended from treating patients and, after further investigation by Cabrini's Human Resources Department, he was terminated.

Plaintiff then commenced this action, setting forth claims against Cabrini for negligence in hiring Dr. Favara and in failing to adequately safeguard plaintiff; against Dr. Favara and Cabrini for medical malpractice; and against Dr. Favara for battery, lack of informed consent, and intentional infliction of emotional distress. The complaint also alleged that Cabrini was vicariously liable for Dr. Favara's conduct because he was acting within the scope of his employment or under apparent authority from Cabrini. We note that the liability of Dr. Favara is no longer at issue as a judgment has already been entered against him.

Cabrini subsequently moved for summary judgment dismissing the complaint on the ground that there was no evidence it was negligent in its supervision of Dr. Favara. It also asserted that it could not be vicariously liable for Dr. Favara's conduct since it was not within the scope of his employment and was committed solely for his personal gratification.

Opposing the motion, plaintiff argued that there was an issue of fact as to whether Dr. Favara's actions were performed within the scope of his employment. Plaintiff argued further that there was an issue of fact as to whether Cabrini, via its nurses, fulfilled its duty to safeguard her during her recovery. In support of her position, plaintiff submitted the affirmation of Dr. G. P. Carrera. Among other things, Dr. Carrera opined that Cabrini had a heightened responsibility to be vigilant in protecting plaintiff because she had been sedated. This heightened duty, it was alleged, required the ASU nurses to stop and question Dr. Favara, ascertain the reason for his presence before permitting him to approach plaintiff, and monitor his interaction with plaintiff.

Supreme Court held that Dr. Carrera's affidavit raised an issue of fact as to whether Cabrini had a "heightened responsibility" to safeguard plaintiff. This responsibility, Supreme Court believed, required the Cabrini nurses to be aware of Favara's presence, to inquire as to his intentions, and to ensure that any examination was performed in compliance with hospital rules, which mandated that a female witness be present during a pelvic examination. As to the issue of vicarious liability, the court concluded that a question of fact existed as to whether Dr. Favara's assault was within the scope of his employment. The court only dismissed the claim for negligent hiring, which plaintiff conceded she could not prove, and the claim for vicarious liability insofar as it was based on apparent authority.[1] We conclude that the court erred in denying summary judgment to Cabrini.

■ Initially, to the extent that plaintiff seeks to hold Cabrini vicariously liable for the sexual assault committed by Dr. Favara, such liability is not sustainable. An employer may be held vicariously liable for the tortious acts of its employee only if those acts were committed in furtherance of the employer's business and within the scope of employment (see, *Riviello v Waldron*, 47 NY2d 297). Based upon this principle, it has been

---

1. Plaintiff has abandoned her claim of negligent hiring as it was clearly without merit. Dr. Favara was hired after a thorough screening by the hiring committee that revealed, among other things, glowing references.

repeatedly held that, where a hospital employee commits a sexual assault, such conduct is not in furtherance of the employer's business and cannot form the basis for vicarious liability (*Judith M. v Sisters of Charity Hosp.*, 93 NY2d 932; *Mataxas v North Shore Univ. Hosp.*, 211 AD2d 762; *Nicollette T. v Hospital for Joint Diseases/Orthopaedic Inst.*, 198 AD2d 54; *Cornell v State of New York*, 60 AD2d 714, *affd* 46 NY2d 1032). Here, of course, there is no question but that Dr. Favara committed a sexual assault, not an examination, and no one, including plaintiff, seriously contends otherwise.

Notwithstanding these long-settled principles, the dissent asserts that because doctors, by virtue of their profession, are sometimes authorized to examine the most intimate portions of the human body, a sexual assault committed by a doctor may be within the scope of his employment. The dissent then reaches the conclusion that the sexual assault in this case was the equivalent of a medical procedure, namely, a pelvic examination—even though it is uncontroverted that Dr. Favara was sexually assaulting plaintiff, and not conducting a pelvic examination. According to the dissent, this conclusion is warranted because the doctor's violation of plaintiff's most private parts "would be, under other circumstances, a medical procedure." This analysis does not bear scrutiny.

Once it is determined that Dr. Favara, who was not plaintiff's physician, committed a sexual assault, his acts were, as a matter of law, "wholly personal in nature, outside the scope of his employment, and not in furtherance of defendant hospital's business," which, of course, is to provide medical treatment (*Nicollette T. v Hospital for Joint Diseases/Orthopaedic Inst.*, *supra*, at 55). A sexual assault committed by a physician can never be considered a mere deviation from the physician's role as a provider of medical care (*cf., Jones v Weigand,* 134 App Div 644). Because of this, we are unable to perceive how this sexual assault, committed upon a victim who was not the doctor's patient, could be considered to be within the penumbra of the doctor's employment. Since the assault was not within the scope of employment, it follows that Cabrini could not be vicariously liable for it.

As a matter of stare decisis, this conclusion is mandated by the Court of Appeals decision in *Judith M. v Sisters of Charity Hosp.* (93 NY2d 932, *supra*). In that case, an orderly was assigned the duty of bathing a patient's entire body (*see,* 249 AD2d 890). While doing so, it was alleged that he sexually abused the patient by engaging in improper touching (*id.,* at

891 [Lawton and Balio, JJ., dissenting]). On this factual scenario, the Court of Appeals held that the employee's conduct was not within the scope of employment because he "departed from his duties for solely personal motives unrelated to the furtherance of the Hospital's business [citation omitted]" (93 NY2d 932, 933).

What is evident is that there is no legal or factual distinction between *Judith M.* and the instant case. In both cases the abuser, by virtue of his profession, was authorized to touch the most intimate portions of a patient's body while performing his duties. And, in both cases the abuser departed from his employer's business when, for "personal motives unrelated to the * * * Hospital's business," he improperly touched the patient. *Judith M.*, therefore, specifically undermines the foundation of the dissent's reasoning.

If this were not enough, the facts of this case present an even more compelling basis for dismissal than those present in *Judith M.* In *Judith M.*, it should be recalled, the abuser committed the sexual assault while performing his assigned duties, namely, bathing the patient. Here, by contrast, it is undisputed that the abuser was not assigned to perform any employment-related activity with respect to the patient—he simply entered a room and assaulted the patient.[2]

The dissent somehow believes that the improper touching of a woman's body is converted into a medical procedure because the touching occurs in a hospital room as opposed to a hospital parking lot. In our view, no amount of legal rhetoric can ever transform the heinous act committed by Dr. Favara into anything other than what it was—a sexual assault. Moreover, no amount of rhetoric can obscure the dissent's failure to explain how a sexual assault furthers a hospital's business as a medical care provider.[3]

The question that remains is whether Cabrini is liable to plaintiff for Dr. Favara's assault because its nurses failed to

---

**2.** Seeking to escape the grasp of *Judith M.*, the dissent analogizes this case to *Sims v Bergamo* (3 NY2d 531). This analogy is flawed. In *Judith M.*, the dissenting Justices at the Appellate Division, pointing to *Sims*, raised the precise analogy now raised by the dissent here (249 AD2d 890, 891, *supra*). The Court of Appeals obviously rejected this analogy when it found that vicarious liability could not be imposed.

**3.** Insofar as the dissent seems to conclude that vicarious liability may be imposed pursuant to the apparent authority doctrine, this too is erroneous. "Essential to the creation of apparent authority are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction" (*Hallock v State of New York*, 64 NY2d 224, 231). Invocation of the doctrine

prevent the attack. It bears reiteration that it is uncontroverted that the nurses were unaware of the assault until after it occurred. Plaintiff contends, however, that this fact is of no legal consequence because the Cabrini nurses were required to stop Dr. Favara, permitting him access to her only after they made a determination that access was appropriate, and that the Cabrini nurses had a duty to monitor Dr. Favara's presence at her bedside to protect against the possibility that he would assault her. These duties, it is alleged, arise from a "heightened responsibility" imposed upon Cabrini to protect plaintiff due to her condition after surgery.

In assessing the viability of these theories of liability, we begin by noting that a hospital unquestionably has a duty to exercise reasonable care and diligence to safeguard a patient from harm inflicted by third persons, measured by the capacity of the patient to provide for his or her own safety (*Killeen v State of New York*, 66 NY2d 850; *Morris v Lenox Hill Hosp.*, 232 AD2d 184, *affd* 90 NY2d 953; *Freeman v St. Clare's Hosp. & Health Ctr.*, 156 AD2d 300; *Clinton v City of New York*, 140 AD2d 404, *lv denied* 73 NY2d 703). The scope of this duty, however, is not boundless and does not require a hospital to guarantee the patient's security against any possible risk, regardless of how remote (*cf.*, *Killeen v State of New York*, *supra*, at 851; *Di Ponzio v Riordan*, 89 NY2d 578, 583). Rather, a hospital's duty to protect its patients is tempered by the maxim enunciated by Chief Judge Cardozo more than 70 years ago that "[t]he risk reasonably to be perceived defines the duty to be obeyed" (*Palsgraf v Long Is. R. R. Co.*, 248 NY 339, 344).

The emergent issue, therefore, is whether Dr. Favara's conduct was reasonably foreseeable. Viewed otherwise, if, as plaintiff alleges, the Cabrini nurses had a duty to make inquiry of Dr. Favara before he approached plaintiff and to monitor him thereafter, such a duty must arise because Dr. Favara's conduct was reasonably foreseeable. We do not believe that it was.

An act of sexual deviance committed by a doctor with no history of sexual misconduct is no doubt possible, as is evidenced

---

requires that the party asserting the agency have justifiably relied on the representations of the principal (*see*, *Bank v Rebold*, 69 AD2d 481; Restatement of Agency [Second] § 267). Here, plaintiff's papers are devoid of any explanation as to how she relied upon a representation by Cabrini concerning Dr. Favara. Nor could plaintiff demonstrate such reliance since she was only semi-conscious when the assault began, and, immediately upon becoming lucid, did everything in her power to resist Dr. Favara.

by its occurrence in this case. In assessing the scope of the duty owed by Cabrini's nurses, however, a mere possibility of improper conduct is insufficient to impose liability since, historically, liability for negligence has been determined by what is probable, not merely by what is possible (*see, Velez v City of New York*, 157 AD2d 370, *lv denied* 76 NY2d 715; *see also,* Comment, 1A NY PJI 186 [3d ed 2000]). "[A]lthough virtually every untoward consequence can theoretically be foreseen * * * the law draws a line between remote possibilities and those that are reasonably foreseeable because '[n]o person can be expected to guard against harm from events which are * * * so unlikely to occur that the risk * * * would commonly be disregarded' [citations omitted]" (*Di Ponzio v Riordan*, 89 NY2d 578, 583, *supra*). Here, the possibility that a surgical resident with no history of sexual misconduct would enter a surgical recovery room and assault a patient is too remote to be considered legally foreseeable.[4] This conclusion is directly supported by *Cornell v State of New York* (60 AD2d 714, *affd* 46 NY2d 1032, *supra*).

In *Cornell*, the infant plaintiff was a patient at a State mental health facility. During his commitment to that facility an attendant committed a homosexual act upon him. The plaintiff commenced an action against the State seeking to hold it liable for the sexual assault. Finding that liability could not be imposed, the Appellate Division pointed out that the attendant was hired upon strong recommendations of his former employers and had good or excellent ratings during the six years he worked for the State. The Court then stated:

> "[N]othing in the record indicates that the State either knew or should have known of [the attendant's] alleged dangerous homosexual tendencies. Under these circumstances, the risk that he might commit a homosexual act with claimant was not 'reasonably to be foreseen' [citations omitted]" (*id.*, at 714).

Neither plaintiff nor the dissent suggests any reason why the assault in *Cornell* is regarded as a risk not "reasonably to

---

4. Obviously the situation would be different if the hospital had permitted Dr. Favara to practice after he committed a prior sexual assault. In that case liability would be premised not on the failure of the recovery room nurses to monitor Dr. Favara but on the hospital's negligence in hiring Dr. Favara or continuing to employ him.

be foreseen" while the assault here is foreseeable.[5] Recognizing this, the dissent seeks to distinguish *Cornell*, noting that, unlike the instant case, there is no indication that other hospital staff were in the vicinity at the time of the attack. This is a distinction without a difference as it fails to address *Cornell*'s unequivocal holding that the absence of prior knowledge of propensity renders the attack unforeseeable. The dissent then states that "there is a difference between an [attendant] and a physician." Hence, the dissent reaches the anomalous conclusion that an assault committed by an attendant is *not* foreseeable, but an assault committed by a doctor *is* foreseeable.

As to the dissent's intimation that the requirement of foreseeability can somehow be dispensed with because Cabrini owed plaintiff a heightened duty to protect her from its doctors, this intimation overlooks a fundamental axiom—any claim of negligence requires proof that the harm was reasonably foreseeable (*see, Di Ponzio v Riordan, supra*). Thus, whether there is a heightened duty or not, liability may not ensue unless it can be said that the harm was foreseeable. Apparently, the dissent believes that it is reasonable to assume that a doctor will sexually assault a patient. This is an assumption with which we cannot concur.

Nor can we agree that foreseeablity may be established because Dr. Favara's assault was allegedly within a "class of foreseeable hazards." At its core, plaintiff's claim in this action is that Cabrini, via its nurses, was negligent in failing to supervise Dr. Favara's interaction with her. This being so, it is settled law that a necessary element of a negligent supervision claim requires a showing that the defendant knew of the employee's propensity to commit the tortious act or should have known of such propensity had the defendant conducted an adequate hiring procedure (*Ray v County of Delaware*, 239 AD2d 755, 757; *see also, Judith M. v Sisters of Charity Hosp.*, 93 NY2d 932, *supra*; *Sato v Correa*, 272 AD2d 389; *Honohan v Martin's Food*, 255 AD2d 627; *Seegers v Shibley Summer Day Camp*, 255 AD2d 499; *Kenneth R. v Roman Catholic Diocese*, 229 AD2d 159, *lv dismissed* 91 NY2d 848). The failure to es-

---

**5.** On the appeal from the Appellate Division's decision in *Cornell*, the Court of Appeals did not discuss the subject of foreseeability. Instead it focused on a different issue raised by the plaintiff on that appeal. An examination of the briefs filed with the Court, however, shows that the negligence issues were raised. The Court of Appeals chose not to address them, other than to state: "As to plaintiff's other contentions, we find them to be without merit" (46 NY2d 1032, 1034, *supra*).

tablish this element renders the tortious conduct unforeseeable as a matter of law (*id.*).

By seeking to reclassify the contours of foreseeability in this case, plaintiff and the dissent propose to alter long-standing principles in this area of jurisprudence. In a negligent supervision case, for instance, it would no longer be necessary to establish that the defendant knew or should have known of an employee's propensity to engage in criminal conduct. Rather, the mere theoretical possibility of such conduct would be sufficient to demonstrate foreseeability. In addition, in a negligent supervision case the status of the wrongdoer, i.e., a surgical resident, would be an irrelevant factor. The foreseeability of a sexual assault would be the same whether the tortfeasor was a surgical resident entering a surgical ward or a rapist entering from the street.

The dissent's response to these points is that this case does not involve a negligent supervision claim. Rather, it involves a claim that Cabrini breached its duty to protect its patients. We find the dissent's approach quite interesting as *Judith M.* instructs otherwise. Examination of the nisi prius decision in *Judith M.* shows that the hospital was alleged to have been negligent in failing to supervise the orderly who committed the assault while bathing the plaintiff. In seeking to support this claim, the plaintiff stated:

> "The hospital failed to limit [the orderly's] direct patient care and/or failed to *supervise* his actions at all times that he came into contact with a female patient * * * [The h]ospital has a *duty to protect* its patients from undue harm * * * [The h]ospital did not even curtail [the orderly's] contact with female patients, instead he was allowed to continue giving direct *unsupervised* care to female patients" (emphasis added).

If one inserts the words "Dr. Favara" for the word "orderly" in the preceding paragraph it becomes evident that the claim in this case is premised on the identical legal theory advanced in *Judith M.*, namely, that the hospital was negligent in permitting an employee to have unsupervised contact with a patient. Viewed otherwise, just as in *Judith M.*, it is alleged that Cabrini was negligent in failing to protect plaintiff from Dr. Favara, failing to curtail Dr. Favara's contact with plaintiff, and failing to supervise Dr. Favara at all times that he was with plaintiff. Faced with such a claim, the Appellate Division in *Judith M.* concluded that the plaintiff's claim was deficient

because there was no proof that the hospital knew or had reason to know of the orderly's propensity to commit the tortious act, and the Court of Appeals affirmed that determination. Thus, we cannot agree with the dissent's contention that our case does not involve a negligent supervision claim, and that the elements of such a claim need not be demonstrated.

In concluding that a nurse is not required to stop and make inquiry of a doctor or supervise the doctor's interaction with a patient, we are guided not only by the aforementioned observation that doctors do not normally commit sexual assaults upon patients, but also by the practical consideration that the duty the plaintiff and the dissent ask us to adopt is unmanageable (*see, Di Ponzio v Riordan*, 89 NY2d 578, 583, *supra*; *De Angelis v Lutheran Med. Ctr.*, 58 NY2d 1053, 1055, citing *Becker v Schwartz*, 46 NY2d 401, 408). For example, such a duty would require nurses throughout a hospital to monitor any doctor they were unfamiliar with whenever such doctor sought to approach a patient who, because of anesthesia, medication, or some other condition, was not fully lucid. This responsibility would, of course, present itself not only in recovery rooms but also in intensive care units and emergency rooms, in addition to countless other locations throughout the hospital. It goes without saying that requiring nurses to be the gatekeepers between doctors and patients would place an undue and weighty burden upon nursing staffs when viewed against the improbability of harm.

In the end, we have no doubt that a nurse stationed at the bedside of every incapacitated patient might prevent a doctor from committing an assault; however, the burden that would be imposed upon a hospital and its nurses would be disproportionate to the risk being protected against. The duty owed by one member of society to another is a legal issue and, under such circumstances, the law does not impose a duty (*see, Di Ponzio v Riordan, supra*; *Eiseman v State of New York*, 70 NY2d 175, 187).

The dissent, attempting to downplay the significance of the duty it would seek to impose, notes that nurses in neonatal units do not permit physicians "*unconnected with that unit* to simply walk in [and] * * * administer to a neonate" (emphasis added). This, it is asserted, shows that nurses are already burdened with a duty to act as gatekeepers between doctors and patients. As to this, we make two observations. First, there is no evidence in the record regarding the workings of a neonatal unit. Second, in this case, Dr. Favara was not "uncon-

nected" to the ASU. Rather, he was a *surgical* resident entering a *surgical* ward where, the evidence shows, it was common and appropriate for doctors, residents, interns, and students to enter and attend to patients.

Actually, the facts of this case highlight the inappropriateness of requiring nurses to interpose themselves between patient and doctor. Nurse Reyes testified at her deposition that it was not her practice to question the various residents and interns entering the ASU because "normally, there are so many doctors that come" and "[t]hey have so many things to do." She further testified that, because so many doctors come in, there were no guidelines requiring inquiry of those physicians entering the ASU. In reflecting on what happened to plaintiff, Nurse Gamboa testified that she wondered how Dr. Favara committed the assault since he did not spend enough time in the ASU to do an examination and she did not even notice his presence until he was on the way out. The dissent, nevertheless, asserts that under this scenario the nurses had a duty, for the minute or so that Dr. Favara was in the ASU, to discontinue what they were doing for a different patient to ascertain Dr. Favara's purposes, even though they knew he was a doctor.

Seeking to diminish the novelty of this approach, the dissent states its proposed duty would not "require nurses to 'stand guard' or 'interrogate' anyone. Rather, what would be imposed * * * is an obligation to pay attention when something unusual occurs or someone out of the ordinary appears." To support this position the dissent argues that, "[h]ad Nurse Reyes observed a stranger entering the room, her professional responsibilities would have required her to take some action, if only to call security." By pointing to an example of a stranger entering the ASU the dissent illustrates the novelty of its view. There is no question that if Nurse Reyes observed a stranger entering the ASU she should have taken action. This is because the presence of a stranger would be unusual. It remains unchallenged, however, that it was not unusual for a surgical resident, such as Dr. Favara, wearing proper identification to enter the ASU. It should follow that there was no reason "to take some action."

Ultimately, the position advocated by the dissent ignores the commonly understood hierarchy at work in medical institutions. After all, "[t]he primary duty of a hospital's nursing staff is to follow the physician's orders" unless such orders are clearly contraindicated (*see, Toth v Community Hosp.*, 22 NY2d 255, 265; *see also*, 10 NYCRR 405.5 [b] [1] [i]). To advocate, as

does the dissent, that doctors start reporting to nurses before they approach patients flies in the face of the everyday workings of hospitals and fundamentally reorders the physician/nurse relationship. In advocating for a rule requiring doctors to obtain prior authorization from nurses before they may approach patients, the dissent does not point to any generalized practice in the medical field that requires doctors to get such pre-approval. Nor does the dissent point to a single appellate case that has found such a duty to exist as a matter of common law.

Finally, we address the dissent's comment that our legal conclusions are "harshly worded" and "unnecessarily rigid." To this we can only say that following settled law is neither harsh nor rigid, it is stare decisis. We recognize that plaintiff's circumstances are extraordinarily sympathetic and that she has been the victim of an outrageous crime. This, however, does not provide a basis for casting aside settled principles of law. In the end, a sexual assault is not within the scope of a doctor's employment, and a sexual assault committed by a doctor with no history of sexual misconduct is not foreseeable.

Accordingly, the order of the Supreme Court, New York County (Karla Moskowitz, J.) entered August 19, 1999, which denied Cabrini Medical Center's motion for summary judgment dismissing the claims against it premised upon negligence and respondeat superior, and granted the motion insofar as plaintiff's vicarious liability claim was premised upon apparent authority, should be modified, on the law, to the extent of granting the motion in its entirety, and otherwise affirmed, without costs. The Clerk is directed to enter judgment in favor of defendant Cabrini Medical Center dismissing the complaint as against it.

SAXE, J. (dissenting). At the end of his often harshly worded writing, our learned colleague, although acknowledging that the "plaintiff's circumstances are extraordinarily sympathetic," holds that established case law requires dismissal of the claims of this young female patient against the hospital responsible for her care. We believe otherwise, and find that his approach is unnecessarily rigid. The law, contrary to the view of our colleague, is not an unchanging body of doctrines to be inflexibly applied, but instead is a set of rules and principles perpetually in the gradual process of re-examination, as courts consider particulars not previously addressed (*see generally*, Cardozo, Nature of the Judicial Process, at 24-25 [Yale Univ Press]). By

applying its immutable view of the law to the present case, this Court has caused a young woman seeking justice to come up short today. That is why we write in opposition.

While lying helplessly in a hospital recovery room bed, recovering from vaginal surgery and the powerful effects of anesthesia, plaintiff N. X., a 25-year-old college student and part-time waitress, was approached by a first-year medical resident, who strode past a group of recovery room nurses and proceeded to perform an unwanted and unnecessary pelvic examination on her. Although the perpetrator is unquestionably liable for the injuries he caused her, the question addressed on this appeal is whether Ms. X. may sue the hospital for negligence based upon an alleged breach of its duty to protect her or upon a theory of vicarious liability.

Based upon an analysis of the facts alleged and an application of the existing law to these facts, the motion by defendant hospital for summary judgment addressed to Ms. X.'s claims of direct negligence as well as vicarious liability[1] should have been denied. To do so would not overrule or alter any binding authority, despite the concerns voiced by the majority.

The essential facts are as follows:

Ms. X. had undergone laser surgery to remove vaginal warts at the Ambulatory Surgical Unit (ASU) of Cabrini Medical Center (Cabrini). Before the surgery, an anesthesiologist gave her a caudal block and intravenous sedation. Following successful completion of the operation and while still experiencing the effects of the anesthesia, Ms. X. was admitted to the ASU's Phase 1 Recovery Room. Although she awoke briefly on the way to the recovery room, she soon fell back to sleep.

Ms. X. was the first patient brought to the recovery room that morning, and was admitted by Nurse Imelda Reyes, who had already received and examined her patient chart, which listed the names of the physicians connected with the surgery and the patient's care, including the surgeon, the anesthesiologist, and the assisting physician. Ms. X. was then left to rest, while Nurse Reyes and Nurse Chung, the other attending nurse, turned their attention to a newly admitted patient on the stretcher next to her. The two nurses were soon joined by their supervisor, Linda Gamboa.

A short time later, defendant Dr. Andrea Favara, a first-year resident working at the hospital for less than one month,

---

1. Plaintiff concedes that her first cause of action, for negligent hiring, was properly dismissed.

entered the ASU. Although he was wearing hospital garb and proper identification, Dr. Favara was not personally known to the nurses, nor was he one of the physicians listed on Ms. X.'s chart who had assisted in the surgery. In spite of his unfamiliarity, these three experienced nurses allowed the resident to enter without inquiry, and he proceeded to the side of plaintiff's bed.

Ms. X. awoke to find the medical resident pulling her hospital gown over her head and pushing her thighs apart. He then placed his fingers inside her vagina and anus. Although weak and groggy, plaintiff attempted to pull her gown down to cover her body, and asked him several times to stop. After her third entreaty, he removed his fingers, causing her intense pain. He then departed quickly. According to plaintiff, she then began to cry and call out for a nurse, to inquire whether Dr. Favara was supposed to have examined her.

As a result of this egregious conduct, Ms. X. asserts that she was injured physically, emotionally and psychologically.

This appeal concerns plaintiff's direct claims against Cabrini on a theory of negligence in failing to adequately safeguard her, as well as on a theory of vicarious liability. Cabrini has disclaimed any responsibility, and the majority agrees with this disclaimer. Cabrini contends, and the majority holds, that the direct negligence claim cannot succeed since Dr. Favara's misconduct was unforeseeable as a matter of law, that public policy precludes a requirement that nurses take the kind of actions that would have protected Ms. X., and that vicarious liability is unavailable since the doctor was acting outside of his authority. We disagree.

### The Hospital's Direct Negligence

The motion court correctly concluded that issues of fact preclude summary judgment as to whether the hospital was itself directly negligent in failing to carry out its duty to protect Ms. X. during her recovery.[2]

It is undisputed that a hospital has "a duty to take reasonable care to protect its patients from injury" (*Freeman v St. Clare's Hosp. & Health Ctr.*, 156 AD2d 300, citing *Killeen v State of New York*, 66 NY2d 850, 851; *see, Morris v Lenox Hill*

---

**2.** Contrary to the majority's position, the duty relied upon by plaintiff is not "[a]t its core" a duty to supervise the resident. The crux of plaintiff's claim is the hospital's *undisputed* duty to protect its patients, not its obligation to supervise its employees.

*Hosp.*, 232 AD2d 184, *affd* 90 NY2d 953). "The degree of care owed is commensurate with the patient's capacity to provide for * * * her own safety" (*Killeen, supra*, at 852). Accordingly, not only was Cabrini bound to protect Ms. X., but its duty was heightened since she was incapacitated due to the effects of anesthesia. Nevertheless, the majority asserts that because the unauthorized pelvic examination was committed by a resident with no history of misconduct, there necessarily was no breach of duty here, as a matter of law.

Of course, a hospital's duty does not extend to guaranteeing a patient's security against all possible risks. Rather, the duty is imposed when a risk is reasonably foreseeable (*see, Di Ponzio v Riordan*, 89 NY2d 578, 583). The majority relies on this premise to conclude that no duty exists unless the wrongdoer has a history of misconduct, since only then would such an act be foreseeable. However, this reasoning improperly determines the issue of foreseeability as a matter of law.

The question of whether an injury is foreseeable is ordinarily for the jury to decide (*see, Rivera v New York City Tr. Auth.*, 77 NY2d 322, 329). Although there are some circumstances in which courts may decide as a matter of law that an occurrence was not a foreseeable consequence of a defendant's conduct (*see, Di Ponzio v Riordan*, 89 NY2d 578, *supra*), it is important to keep in mind that the *precise* type of harm that occurred need not have been foreseeable (*id.*, at 584; *see also*, PJI3d 2:12). Rather, it need only be among a "class of foreseeable hazards that the duty exists to prevent" (*id.*).

Even if we were to accept the assertion that an unauthorized and unnecessary pelvic exam of a patient by a physician is so rare as to be deemed a "remote" possibility and, therefore, legally unforeseeable, it may nonetheless fall within a "class of foreseeable hazards." Indeed, the fact that hospitals are held to a legal duty to protect patients—particularly when the patients' condition makes it difficult or impossible for them to protect themselves—reflects an implicit recognition that there is a class of foreseeable hazards which such incapacitated patients must be guarded against (*cf., Cucalon v State of New York*, 103 Misc 2d 808, 813). That class includes the possibility of assaults or unauthorized acts committed on unconscious or semiconscious patients by people with no right or authority to approach or make contact with them.

Furthermore, a holding at this juncture that the misconduct was unforeseeable as a matter of law fails to take into account the surrounding facts and circumstances known to hospital

personnel just prior to Dr. Favara's unauthorized pelvic exam. Rather than absolutely extinguishing the established duty, in situations such as those presented here, proper resolution of the issue of whether a breach of duty occurred requires consideration of all the surrounding facts and circumstances. These would include any observations the hospital staff could or *should have* made at the time immediately preceding the actual wrongdoing, of things sufficiently unusual or out of the ordinary as to strengthen the possibility of misconduct, in order to warrant some curative action or follow-up.

Here, for instance, the nurses were aware of the identity of the patient's physicians, and were unacquainted with Dr. Favara. A finder of fact could conclude that they should have paid more attention upon observing an unknown physician, with no relation to the patient's care, approaching the patient. Furthermore, plaintiff's family physician, Dr. G. Peta Carrera, asserted that he was familiar with Cabrini's procedures and routines, under which first-year residents usually remained on the hospital floor where the operating room was located, and rarely were called to the ASU recovery room. Nurse Reyes also acknowledged that residents were never directly assigned to the Ambulatory Surgical Unit. Therefore, although Dr. Favara was, as the majority writer emphasizes, a surgical resident, there is an evidentiary basis from which a jury could conclude that Dr. Favara's presence in the ASU recovery area should have been cause for attention, if not concern.

Additionally, the hospital's formal policy requiring the presence of a nurse when a male physician conducts a gynecological examination, and the testimony that a female witness is supposed to be present for *any* examination of a female patient by a resident, might support a finding that a nurse should have remained nearby or paid closer attention upon observing a male resident approaching with the apparent intention of conducting an examination on Ms. X. This is especially so since the nature of the surgery performed on her made it substantially more likely that an examination would entail a procedure requiring a nurse to be present.

The majority states that *Cornell v State of New York* (60 AD2d 714, *affd* 46 NY2d 1032) stands for the proposition that an assault by a hospital employee in good standing is always unforeseeable as a matter of law. However, in *Cornell*, where a 14-year-old patient at a mental health facility was sexually assaulted by an attendant with a previously clean record, there was no evidence that other hospital staff in the vicinity at the

time of the attack had arguable reason to be suspicious or watchful of the person committing the assault. Moreover, there is a difference between an orderly and a physician who is hired and authorized to perform such procedures.

Similarly, although claims of negligent failure to safeguard patients were dismissed on summary judgment in *Judith M. v Sisters of Charity Hosp.* (93 NY2d 932) and *Mataxas v North Shore Univ. Hosp.* (211 AD2d 762), in neither case was there any claim of negligence by virtue of the inaction of other staff with reason to take action to protect a patient. In contrast, here the observations of and information known to staff at the scene are sufficient to create an issue of fact as to the foreseeability of misconduct on the part of Dr. Favara. If those observations and that information are found to have made misconduct foreseeable, the imposition of the duty to protect patients would accordingly become appropriate.

To illustrate the point, were a well-known and respected physician to enter a patient's private room and, without warning, commit an assault there, the hospital's duty to protect patients would be inapplicable to that situation. However, if immediately prior to entering a patient's room, the physician had conducted himself in an unusual and suspicious manner, and his conduct had been observed by other hospital staff, the hospital's duty of protection might indeed require some action. In such circumstances, it would be appropriate to ask whether the hospital's staff acted in accordance with that duty.

The foregoing analysis does not *require* a conclusion that the hospital breached its duty. We merely emphasize that inasmuch as the hospital admittedly has a duty to protect its patients to a certain extent from foreseeable risks, it is inappropriate to ignore that duty without considering the particular circumstances surrounding the incident, and whether the hospital's staff had, or should have had, sufficient awareness or information to raise an issue of fact as to whether a risk to the patient was foreseeable.

The possibility that the hospital's duty to protect its patients may apply in these circumstances would not create a rule too broad or too vague. Indeed, it would create no new rule at all. We merely point out that the foreseeability of the risk of harm to patients from a hospital employee is not necessarily limited to the question of whether that employee has a prior history of misconduct. When allegations regarding the circumstances surrounding the misconduct raise the possibility that harm was foreseeable, the question of whether imposition of the duty is appropriate may present a preliminary issue of fact.

Beyond the foregoing legal issues, the majority also concludes that policy considerations preclude imposition of a duty to safeguard patients in this context, finding that such a duty would be onerous and impractical. In order to do so, they exaggerate and distort the ramifications of such a duty, concluding, for example, that nurses would necessarily be required to stand guard over patients, stop all physicians who are approaching patients, and interrogate them as to their intentions. Of course, this scenario would not be the result of denying summary judgment to the hospital in this case.

We merely conclude that the hospital's duty to protect incapacitated patients from injury ought not to be eliminated as a matter of law when its staff arguably has reason to take some action for the protection of those patients. This would in no way require nurses to "stand guard" or "interrogate" anyone. Rather, what would be imposed, *in appropriate circumstances*, is an obligation to pay attention when something unusual occurs or someone out of the ordinary appears, and make reasonable inquiry *when a situation warrants it*. Although this would not mean that a nurse must keep each patient under constant surveillance, in particular settings, such as a recovery room, where the patients' ability to protect themselves may be absent or diminished, there might be some degree of responsibility imposed, if the circumstances warranted it.

We need not ignore the reality that a nurse's functions at times already include elements of guarding patients from harm. Indeed, the rules of ethics applicable to nurses specifically recognize a nurse's obligation to safeguard not only patients' health, but their safety as well (*see*, Am Nurses' Assn Code for Nurses 3.1 [contained in Codes of Professional Responsibility: Ethics Standards in Business, Health and Law (4th ed)]). These are not duties invented by courts of equity, but rather, tenets of ethical responsibility issued by the profession itself. Had Nurse Reyes observed a stranger entering the room, her professional responsibilities would have required her to take some action, if only to call security. Likewise, had she observed the resident donning surgical gloves, by her own testimony she recognized that she would have had a responsibility to take action to ensure compliance with hospital regulations regarding physical or pelvic exams of female patients. The same obligation might even apply if she observed a male physician well known to her donning surgical gloves as he approached a female patient recovering from a gynecological procedure.

We should also recognize that in certain hospital departments such as intensive care units and neonatal wards, where the needs of the patients clearly require stringent limitations on who is permitted entry, the tasks of the assigned nurses commonly include preventing unauthorized individuals from approaching patients. In certain circumstances, such unauthorized individuals might even include staff physicians. For instance, it defies credulity that nurses in a neonatal intensive care unit would allow a physician unknown to and unconnected with that unit to simply walk in, approach an incubator and begin to administer to a neonate, without taking immediate action to ensure that the physician was acting properly. Therefore, unquestionably, status as a first-year resident does not alone suffice to entitle an individual to freely examine patients in all sections of the hospital.

And, of course, nurses and other hospital staff are always bound by a duty to make further inquiry when a physician's orders or conduct " 'are so clearly contraindicated by normal practice that ordinary prudence requires inquiry into the correctness of the orders' " (see, Christopher v St. Vincent's Hosp. & Med. Ctr., 121 AD2d 303, 306, quoting Toth v Community Hosp., 22 NY2d 255, 265, n 3, citing Fiorentino v Wenger, 19 NY2d 407, 414-415). Given these realities, it is somewhat disingenuous to protest over imposing any duty which may require nurses to protect patients from the misconduct of physicians.

Therefore, the concern professed by the majority, that permitting plaintiff to proceed with her claim that the hospital breached its duty to protect her would grant nurses some new and inappropriate authority over physicians in the hospital hierarchy, is unwarranted. There is nothing improper about a nurse inquiring of a physician, particularly a brand-new physician, present in a hospital location where such physicians are not normally found, whether any assistance is needed. Nor can it be improper for a nurse to attempt to intervene where a physician appears to be committing obvious misconduct, despite their respective positions in the hospital hierarchy.

We see no reason to preclude a trial on plaintiff's claim of negligence on the part of the hospital in this instance.

### Vicarious Liability

Plaintiff's cause of action seeking to hold the hospital vicariously liable for Dr. Favara's misconduct also should have been permitted to proceed to trial.

While a hospital will not be held vicariously liable for the tortious conduct of employees who were acting *outside the scope of their employment* (*see, Judith M. v Sisters of Charity Hosp.,* 93 NY2d 932, *supra; Mataxas v North Shore Univ. Hosp.,* 211 AD2d 762, *supra*), since the question of whether an employee's actions fall within or outside the scope of his employment "is so heavily dependent on factual considerations, the question is ordinarily one for the jury" (*Riviello v Waldron,* 47 NY2d 297, 303 [citations omitted]; *see also, Nicollette T. v Hospital for Joint Diseases/Orthopaedic Inst.,* 198 AD2d 54). In the context of this summary judgment motion, we cannot conclude that Dr. Favara's *actions,* as a matter of law, were outside the scope of his normal assigned tasks as a hospital resident.

For an act to be within the scope of employment, it must have been performed, at least in part, in furtherance of the duty owed to the employer (regardless of how ineptly or misguidedly), and not solely pursuant to his own personal motives (*see, Overton v Ebert,* 180 AD2d 955, 957, *lv denied* 80 NY2d 751; *Island Associated Coop. v Hartmann,* 118 AD2d 830). Just as a physician who conducts an operation without first obtaining the patient's consent, thereby committing an assault upon the patient, is still acting within the scope of his employment (*see, Oates v New York Hosp.,* 131 AD2d 368, 369), performing a pelvic examination without permission, although constituting an assault, may simultaneously constitute conduct within the scope of the resident's employment. Similarly, where the examination was conducted for a deviant purpose, an otherwise standard examination may amount to an assault; nevertheless, the deviant mental state of the physician while performing the examination does not remove the task itself from the scope of the physician's employment.

In contrast to, for instance, a beating or an act of rape committed by an employee, which are unquestionably not in furtherance of the employer's purpose, the complained-of conduct here would be, under other circumstances, a medical procedure, when performed on a patient by a physician employed by the hospital. If the examination performed by Dr. Favara had been performed by a physician specifically assigned to plaintiff's care, it would clearly have fallen within the scope of that physician's employment. As long as a physician is authorized to perform the procedure, any sexual gratification experienced in the process could render the physician's motives mixed, but would not necessarily mean that the examination was performed *solely* for personal motives.

Here, although Dr. Favara was not specifically assigned to plaintiff's care, it has not been established as a matter of law that he was unauthorized to perform a pelvic examination. All that is established at present is that the offensive conduct was committed on the employer's premises by a staff physician apparently doing a task that falls within the scope of what a staff physician normally does.

In the majority's view, the assaultive nature of Dr. Favara's conduct necessarily separates his acts from those that fall within the scope of his employment. However, the fact that an employee's actions constituted a tort, or even a crime, does not necessarily relieve his employer of liability *as a matter of law.* Although *generally* an employer will not be held liable for an employee's criminal attack on a third party (*see, e.g., Adams v New York City Tr. Auth.*, 88 NY2d 116), where the employee is afforded the discretionary authority to employ assaultive tactics, vicarious liability may lie. For instance, a municipality may be vicariously liable for a brutal assault committed by a police officer (*see, Rodriguez v City of New York*, 92 AD2d 813, *affd* 62 NY2d 673); a bar may be vicariously liable for a violent assault by its bartender or bouncer (*see, Sims v Bergamo*, 3 NY2d 531). "[T]he test has come to be ' "whether the act was done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions" ' " (*Riviello v Waldron, supra*, 47 NY2d, at 302, quoting *Jones v Weigand*, 134 App Div 644, 645, quoted in *Baker v Allen & Arnink Auto Renting Co.*, 231 NY 8, 12-13).

The majority's remark that "[a] sexual assault committed by a physician can never be considered a mere deviation from the physician's role as a provider of medical care," while understandably seeking to draw a clear line between medical treatment and an attack by a physician, fails to acknowledge that an unauthorized medical procedure may constitute both a medical procedure and an assault (*see, Oates v New York Hosp., supra*, 131 AD2d, at 369). No legal support is offered for the proposition that an act which would otherwise be within the scope of employment is removed from that category based upon the actor's mental state while performing it. And, the majority does not, and cannot, make a case for considering the criminal act to constitute an "intervening act" which would cut off other liability (*see, Morris v Lenox Hill Hosp.*, 232 AD2d 184, *affd* 90 NY2d 953, *supra*).

In considering whether to apply the doctrine of respondeat superior, it is important to bear in mind the purpose of the

doctrine. The doctrine is an attempt at risk allocation: it imposes upon employers the costs of employees' tortious conduct because the employer derives benefits from the activities which expose others to the misconduct of their employees (*see*, Prosser and Keeton, Torts § 69, at 500 [5th ed]; *Kavanaugh v Nussbaum*, 71 NY2d 535; Sykes, *The Boundaries of Vicarious Liability: An Economic Analysis of the Scope of Employment Rule and Related Legal Doctrines*, 101 Harv L Rev 563, 564-581). Particularly where the employer has bestowed upon the employee substantial job-related authority, the employer reaps a benefit from that assignment of authority, and should therefore bear the risk that an employee will abuse that authority (*see*, Note, *"Scope of Employment" Redefined: Holding Employers Vicariously Liable for Sexual Assaults Committed by their Employees*, 76 Minn L Rev 1513, 1519 [June 1992]). Indeed, the circumstances of this case make the application of the doctrine of respondeat superior particularly appropriate, since the hospital has clothed the physician with the authority to conduct the type of examination in question.

Because the medical procedure was performed by a staff physician at least arguably authorized to perform such exams, the cases upon which the majority relies to reject the vicarious liability claim are not controlling. The conduct of the hospital employees who assaulted the patients in those cases was clearly not part of the tasks they were normally authorized to perform (*see, e.g., Judith M. v Sisters of Charity Hosp.*, *supra* [an orderly who was authorized to bathe the patient, but sexually abused her]; *Mataxas v North Shore Univ. Hosp.*, *supra* [technician operating CAT scan sexually abused patient]). As for the case of *Cornell v State of New York* (46 NY2d 1032, 1033, *supra*), it merely reiterates the rule that an employer will not be held vicariously liable for "entirely personal" torts, such as a sexual assault on a 14-year-old patient by an attendant at a mental health facility. In contrast, in the present case the conduct of the employee, a staff physician, was potentially within that which he was authorized and entrusted to do.

We would hold that an issue of fact as to whether Dr. Favara's conduct fell within the scope of his employment precludes summary judgment.

Finally, support exists for plaintiff's contention that an employer may be held vicariously liable even where the torts of employees were outside the scope of their employment, if the

employee "purported to act * * * on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation" (*see*, Restatement [Second] of Agency § 219 [2] [d]; *and see*, *Faragher v Boca Raton*, 524 US 775, 801). By its terms, this provision applies to "[a] servant[ ] * * * acting outside the scope of [his] employment" (*see*, Restatement [Second] of Agency § 219 [2]). The evidence here is sufficient to support a prima facie claim on this theory of vicarious liability as well.

We would therefore modify so as to reinstate this claim as well as the direct negligence cause of action.

WILLIAMS, J. P., and BUCKLEY, J., concur with FRIEDMAN, J.; RUBIN and SAXE, JJ., dissent in a separate opinion by SAXE, J.

Order, Supreme Court, New York County, entered August 19, 1999, modified, on the law, to the extent of granting the motion for summary judgment dismissing the complaint as against Cabrini Medical Center in its entirety, and otherwise affirmed, without costs.