TEN BROECK DUPONT, INC. (d/b/a Ten Broeck Hospital), Appellant,

v.

Artemecia BROOKS, Appellee.

No. 2006–SC–000484–DG.

Supreme Court of Kentucky.

May 21, 2009.

Charles Thomas Hectus, Hectus, Strause, PLLC, Jeffrey August Calabrese,

John Tilden Ballantine, Walter L. Sales, Stoll Keenon Ogden, PLLC, Louisville, KY, Larry Allen Sykes, Stoll Keenon Ogden, PLLC, Lexington, KY, Counsel for Appellant.

Gary Robert Hillerich, Kevin Crosby Burke, Roger Dale Warren, Louisville, KY, Irwin M. Ellerin, Ellerin & Associates, Atlanta, GA, Counsel for Appellee.

Carole Douglas Christian, Mitzi Denise Wyrick, Wyatt, Tarrant and Combs, LLP, Louisville, KY, Counsel for Kentucky Hospital Association.

Opinion of the Court by Justice SCOTT.

Upon petition of Appellant, Ten Broeck Dupont, Inc., d/b/a Ten Broeck Hospital (Ten Broeck), we granted discretionary review of the opinion of the Court of Appeals affirming the November 30, 2004, jury judgment of the Jefferson Circuit Court, awarding Plaintiff/Appellee, Artemecia Brooks (Brooks) a judgment of two million ninety-one thousand dollars ($2,091,000) in compensatory and punitive damages against Ten Broeck.

Ten Broeck is a psychiatric hospital located in Louisville, Kentucky where Brooks was voluntarily admitted on January 5, 2001. Brooks continued as an inpatient at Ten Broeck until January 9, 2001, and thereafter remained as a day patient from January 10, 2001, to January 20, 2001. In her action against Ten Broeck, Brooks alleged that during her hospitalization Feotis Gilbert (Gilbert), at the time an orderly of Ten Broeck, forced her to have sexual intercourse. Brooks, however, did not sue Gilbert. He was added later as a third-party defendant by Ten Broeck, but dismissed prior to trial.

The matter was tried before a jury resulting in a verdict for Brooks in the amount of one hundred sixty-one thousand dollars ($161,000) for pain and suffering,

one hundred thirty thousand dollars ($130,000) for future pain and suffering, and one million eight hundred thousand dollars ($1,800,000) in punitive damages.[1]

Ten Broeck alleges that the Court of Appeals erred in its opinion affirming, as the trial court committed underlying error (1) in excluding Brooks' medical records while she was a patient at Ten Broeck, as well as her relevant sexual history under KRE 412, the Kentucky Rape Shield Act, for reasons that said records and sexual history were relevant to the issue of damages; (2) by allowing hearsay testimony from several members of Ten Broeck's Staff and Detective Brad Jeffrey concerning Gilbert's conduct; (3) by refusing to instruct the jury on the definition of rape; (4) by giving an "ordinary care" liability instruction premised upon the "degree of care and skill ordinarily expected of reasonable and prudent hospitals acting under similar circumstances," contrary to an employer's liability in Kentucky for intentional misconduct of an employee; (5) by allowing introduction of Gilbert's misdemeanor arrest records; and (6) in refusing to direct a verdict in favor of Ten Broeck on Brooks' claims for negligent hiring/retention and punitive damages.

Having concluded that the trial court erred in (1) excluding, Brooks' Ten Broeck medical records, as well as evidence of her prior sexual history, for reasons that all of same were highly relevant to the issue of damages and the establishment of her mental and emotional condition just prior to the alleged sexual assault; (2) refusing to instruct the jury on the definition of "rape" ("sexual assault"), thereby depriving Ten Broeck of the defense that the alleged "sexual assault" might have been, as argued by Ten Broeck, a consensual sexual encounter; and (3) giving of an "ordinary care" liability instruction contrary to an employer's liability for the intentional acts of its employees outside the course and scope of their employment, we reverse the opinion of the Court of Appeals in regards to these issues, set aside the judgment, and remand this matter back to the trial court for a new trial.

For reasons that shall be set forth herein, we affirm the Court of Appeals' determinations on (1) the testimony of Ten Broeck's staff, as well as that of Detective Jeffrey, concerning Gilbert's conduct; (2) the introduction of Gilbert's fourteen (14) misdemeanor arrests, and (3) its affirmance of the trial court's denial of directed verdicts for Ten Broeck on Brooks' claims of negligent hiring/retention and punitive damages.

## I. The exclusion of Brooks' medical records while a patient at Ten Broeck and evidence of her sexual history pursuant to KRE 412, The Rape Shield Law

We agree with Ten Broeck's contention that the trial court's exclusion of Brooks' medical records while she was a patient at Ten Broeck, as well as evidence of her prior sexual history, pursuant to KRE 412(b)(2), effectively denied it the right to defend itself on the critical issues of (1) whether the sexual activity with Gilbert was consensual, and (2) the issue of Brooks' injury and damages and, thus, constituted error warranting a new trial.

The parties do not dispute that during the 11:00 p.m. to 7:00 a.m. shift on January, 2001, Gilbert and Brooks engaged in oral sex and intercourse. Brooks testified that she refused Gilbert's request for sex on two immediately prior occasions, but on the third such request, Gilbert engaged her in oral sex and "raped" her without

---

1. The case was tried first in March 2004, which resulted in a mistrial. It was re-tried by jury from November 16, 2004, to November 24, 2004.

her consent. She admits, however, that the sexual discussions that preceded the sexual activity, her denials, and the sexual activity itself did not disturb her sleeping roommate, nor did the nearby nurses' station hear any activity.

Brooks' Ten Broeck medical records disclose that she advised the admitting nurse that her libido had recently increased. The records also reflect that she "liked sex too much" and "had been sexually promiscuous and had unprotected sex with numerous men and with at least one woman." She reported conflicted feelings in regard to her sexual promiscuity, stating that she was bi-sexual and that this condition "stresses her."

The records also reflect that on January 8, 2001, Brooks informed her psychiatrist, Dr. Steve Gibson, that she "had sex in the hospital the previous week." Upon further questioning from Dr. Gibson regarding this statement, and his pointing out to her that she had only been in the hospital since January 5, 2001, she stated that she did not remember where, or when, it occurred. Dr. Gibson discussed this matter again with her on January 9, 2001, whereupon she stated she was not sure whether it had occurred at the hospital or the night before she was admitted.

Ten Broeck's records concerning her stay do not reflect that Brooks claimed, at any time, that she had been "raped" in the hospital. The discharge summary reflects that she felt "100% better" in comparison to when she was admitted, that the group sessions had helped her, and that she had done extremely well in treatment. Upon discharge, Brooks indicated that her primary concern was that she may be bisexual and registered concern as to how her boyfriend would react to this.

Later, around January 26, 2001, Brooks told her father that she "had sex" in the hospital. He then contacted an attorney, who advised calling the police, and on January 30, 2001, Gilbert was arrested and charged with raping Brooks. According to Ten Broeck, this was the first time it learned of any rape allegation. Gilbert was acquitted of the criminal charge of rape in a jury trial in August 2004.

Dr. Lisa Goodman testified for Brooks at trial as an expert psychologist. She testified about outcomes associated with sexual assaults "in the general population." In short, she was allowed to testify to a hypothetical damage theory based upon the consequences of an actual rape. Her opinions were based upon damage that a rape could cause an average victim. In contrast, Ten Broeck's expert witness was not allowed to testify on the issue of damages, that Brooks' mother reported that Brooks had been molested at age fourteen (14) by her father, and that her many sexual relationships caused her to express concerns of shame, guilt and lack of self esteem.[2]

In denying admissibility of Brooks' Ten Broeck medical records, as well as the evidence of her sexual history noted above pursuant to KRE 412, the trial court found "[t]here is a strong probability that evidence of Ms. Brooks' prior sexual conduct, if admitted, could unfairly prejudice the jury." Upon motion for reconsideration, the court again denied same, believing that the "jury will be able to fairly and accurately decide whether Ten Broeck was negligent and whether Ms. Brooks sustained any injuries resulting from its negligence without evidence of her past sexual conduct."

**2.** Ten Broeck's expert psychiatrist, Dr. Granacher, was allowed to express an opinion as to family physical abuse, but he was not al-

lowed to discuss the reported molestation and its injuries to her.

The trial court also denied Ten Broeck an evidentiary hearing on the question of admissibility on grounds that KRE 412(c)(2) "only deals with evidence sought to be introduced under KRE 412(b). That section deals with particular acts of sexual conduct which are sought to be introduced to prove that the accused was not the perpetrator. Such is not the case herein."

## A. KRE 412

KRE 412, in its entirety, indicates as follows:

**KRE 412 Rape and similar cases; admissibility of victim's character and behavior**

(a) Evidence generally inadmissible. The following evidence is not admissible in any civil or criminal proceeding involving alleged sexual misconduct except as provided in subdivisions (b) and (c):

(1) Evidence offered to prove that any alleged victim engaged in other sexual behavior.

(2) Evidence offered to prove any alleged victim's sexual predisposition.

(b) Exceptions:

(1) In a criminal case, the following evidence is admissible, if otherwise admissible under these rules:

(A) evidence of specific instances of sexual behavior by the alleged victim offered to prove that a person other than the accused was the source of semen, injury, or other physical evidence;

(B) evidence of specific instances of sexual behavior by the alleged victim with respect to the person accused of the sexual misconduct offered by the accused to prove consent or by the prosecution; and

(C) any other evidence directly pertaining to the offense charged.

(2) In a civil case, evidence offered to prove the sexual behavior or sexual predisposition of any alleged victim is admissible if it is otherwise admissible under these rules and its probative value substantially outweighs the danger of harm to any victim and of unfair prejudice to any party. Evidence of an alleged victim's reputation is admissible only if it has been placed in controversy by the alleged victim.

(c) Procedure to determine admissibility.

(1) A party intending to offer evidence under subdivision (b) must:

(A) file a written motion at least fourteen (14) days before trial specifically describing the evidence and stating the purpose for which it is offered unless the court, for good cause requires a different time for filing or permits filing during trial; and

(B) serve the motion on all parties and notify the alleged victim or, when appropriate, the alleged victim's guardian or representative.

(2) Before admitting evidence under this rule the court must conduct a hearing in camera and afford the victim and parties a right to attend and be heard. The motion, related papers, and the record of the hearing must be sealed and remain under seal unless the court orders otherwise.

When first promulgated in 1992, KRE 412 did not apply to civil cases. However, it was amended effective July 1, 2003, as above and now "applies to any civil ... proceeding involving an 'alleged sexual misconduct.'" Robert G. Lawson, *Kentucky Evidence Law Handbook* § 2.30[2] (4th ed.2003). Except for a slight difference in language KRE 412 is now essentially the same as Fed.R.Evid. 412.

The test of admitting evidence offered to prove sexual behavior or sexual propensity in civil cases differs in three respects from the general rule governing admissibility set forth in Rule 403.

First, it reverses the usual procedure spelled out in Rule 403 by shifting the burden to the proponent to demonstrate admissibility rather than making the opponent justify exclusion of the evidence. Second, the standard expressed in subdivision (b)(2) is more stringent than in the original rule; it raises the threshold for admission by requiring that the probative value of the evidence *substantially* outweigh the specified dangers. Finally, the Rule 412 test puts "harm to the victim" on the scale in addition to prejudice to the parties.

Fed.R.Evid. 412 advisory committee's note (emphasis added).

Prior to the 2003 amendment expanding coverage to civil cases, KRE 412 contained its own balancing standard, i.e., the court was required to find that "the probative value of such evidence outweighs the danger of unfair prejudice." KRE 412(c)(3) (2000 ed.) The 2003 amendment relegated the balancing test for evidence of criminal actions to KRE 403. "[B]y requiring that evidence under [KRE 412(b)(1) ] be 'otherwise admissible under these rules,' the provision brings into play the balancing test of [KRE] Rule 403." Minutes, Evidence Rules Review Commission, Commentary on Amended KRE 412 (September 28, 2001). Thus, contrary to the old rule, the rule today, in its criminal application, "tilts strongly in favor of admission over exclusion." Lawson, supra § 2.30[4][e].

KRE 412's balancing standard in civil actions, however, requiring the court to find that the "probative value of the proffered evidence substantially outweighs the danger of harm to any victim and of unfair prejudice to any party," KRE 412(b)(2), "tilts strongly in favor of exclusion over admission." Lawson, *supra* § 2.30[5].

■ Thus, in a civil analysis under KRE 412(b)(2), the court must determine (1) if the evidence is offered to prove an alleged victim's sexual predisposition or that the alleged victim engaged in other sexual behavior, and, if so, (2) is such other evidence otherwise admissible under any other rule of evidence, particularly KRE 403, and, if so, (3) does its probative value substantially outweigh the danger of harm to any victim and of unfair prejudice to any party.

**B. Is the evidence offered to prove an alleged victim's sexual predisposition or that an alleged victim engaged in sexual behavior?**

■ If the effect of the proof is to prove an alleged victim's sexual predisposition, or that an alleged victim engaged in other sexual behavior, the evidence falls under the guidelines of KRE 412. Thus, this Court has approved under KRS 510.145 (Michie 1985), the predecessor to KRE 412 the exclusion of evidence showing that a stepdaughter had requested birth control devices. *Gilbert v. Commonwealth,* 838 S.W.2d 376, 380 (Ky.1991); *but see Olden v. Kentucky,* 488 U.S. 227, 230, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988) (holding that evidence indicating the victim was seeing another man at the time of the rape and living with him at the time of the trial "was not barred by [our] rape shield law.").

In *Commonwealth v. Young,* 182 S.W.3d 221, 224 (Ky.App.2005), the court held that statements by an alleged victim to her coworker, "that she wanted to engage in sex with [the defendant] to such a degree that it would melt the ice in the water cooler," and that she also commented, in reference to the defendant, "that she 'wanted some of that,'" constituted evidence of sexual behavior, although it was held admissible. *Id.* Yet, evidence that the victim, after the alleged rape, continued an ongoing relationship with the police department at which the defendant worked, which included work as a confidential informant, "in no way involves ... sexual conduct and, as

such, is not covered by Rule 412." *Id.* "Like other 'rape shield' laws, the primary objective of KRE 412 is 'to protect alleged victims of sex crimes against unfair and unwarranted assaults on character.'" Lawson, *supra* § 2.30[3].

Here, the evidence offered by Ten Broeck, even though offered primarily on the issue of damages, in order to attempt to show the extent of Brooks' preexisting injury, necessarily produces proof that Brooks engaged in other sexual behavior and implicates an alleged sexual predisposition. Thus, KRE 412 is applicable.

## C. Whether such evidence is otherwise admissible under the Kentucky Rules of Evidence, particularly KRE 403?

■ Although at times other rules of evidence may be applicable, the reference in KRE 412(b)(2) to the inquiry, "if it is otherwise admissible under these rules," generally implicates KRE 403. Under KRE 403, the probative value of the evidence may not be substantially outweighed by the danger of "confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." KRE 403. Balancing the probative value versus the danger of *undue prejudice* is unnecessary in this step since this test is contained within the language of KRE 412 under the concept of "unfair prejudice."[3]

■ "Confusion of the issues" is generally used to exclude evidence that creates side issues that distract jurors from the real issues of the case. *See, e.g., United States v. Pitocchelli,* 830 F.2d 401, 404 (1st Cir.1987); *Langer v. Monarch Life Ins. Co.,* 966 F.2d 786 (3rd Cir.1992); *United States v. Dakins,* 872 F.2d 1061 (D.C.Cir. 1989). "Misleading the jury" refers primarily to the possibility of the jury over-

valuing the probative value of a particular item of evidence for reasons other than the emotional reaction associated with unfair prejudice. 1 Graham, *Handbook of Federal Evidence,* § 401.7 (4th ed.1996). "Undue delay" or "cumulativeness" are the remaining factors in Rule 403's equation and are designed "to give courts needed discretion to control tireless litigators and to conduct trials efficiently." Lawson, *supra* § 2.10[5].

As to cumulative evidence:

Not all evidence that is duplicative is . . . cumulative. . . . At times it is reasonable for a party to insist that "one witness is good, but two or three will make my case much stronger, even though all will testify in a similar vein." In short, the discretion to exclude cumulative evidence must be exercised in a discriminating fashion, and with wisdom, particularly where the evidence goes to issues of central importance.

Lawson, *supra* § 2.10[5] (*quoting* 1 Mueller & Kirkpatrick *Federal Evidence* § 96 (2d ed.1994)). As is most often the case, rulings upholding the exclusion of cumulative evidence involve the limitation of witnesses testifying in the same vein, or to the same point. *E.g., United States v. Shelton,* 736 F.2d 1397, 1409–10 (10th Cir. 1984); *United States v. Johnson,* 730 F.2d 683, 688 (11th Cir.1984); *United States v. Garrett,* 716 F.2d 257, 272 (5th Cir.1983); *United States v. Gray,* 507 F.2d 1013, 1016 (5th Cir.1975).

In performing the analysis under KRE 403 on these issues, it is important to understand the fundamental difference between KRE 403 and KRE 412. "[T]he primary objective of KRE 412 is 'to protect alleged victims of sex crimes against unfair and unwarranted assaults on char-

---

**3.** "Nothing in the history of Kentucky's Rules suggests that this difference [between 'undue prejudice' and 'unfair prejudice'] is signifi- cant; for certain, the difference would be imperceptible in the operation of the provision." Lawson, *supra* § 2.10[4][a].

acter,'" Lawson, *supra* § 2.30[3] (*quoting* Evidence Rule Study Committee, Kentucky Rules of Evidence—Final Draft, p. 36 (Nov.1989)). KRE 403, on the other hand, "was borrowed from the Federal Rules but is essentially a codification of longstanding evidence doctrine and policy." Lawson, *supra* § 2.10[2]. "The issue [under KRE 403, then,] is whether the search for truth will be helped or hindered by the interjection of distracting, confusing, or emotionally charged evidence." *Id.* (*citing* McLaughlin, *Weinstein's Federal Evidence* § 403.02[1][a] (2d ed.2002)).

Reviewing Brooks' Ten Broeck hospital medical records during her treatment, as well as evidence of her sexual history within the context of the issues and evidence presented at trial, it is clear the evidence was highly probative in regards to the issues of consent and damages. Her comments that she had "sex" at the hospital, rather than being "raped," is relevant to issues of consent, while the remainder of the evidence is relevant to the issues of damages. Moreover, its prejudicial value was minimal on the relevant KRE 403 considerations of "confusion of the issues, or misleading the jury, or by consideration of undue delay, or needless presentation of cumulative evidence." KRE 403.

To suggest, as Appellee does, that Dr. Granacher's testimony on Brooks' medical condition rendered the records (and Brooks' statements therein) cumulative, is inaccurate. Under the court's ruling excluding such evidence, Dr. Granacher could not testify as to Brooks' statements dealing with her sexuality or the mental and emotional turmoil arising from her sexual promiscuity, for which she was seeking treatment. Nor was Appellant's counsel's non-evidentiary comment that Brooks "likes sex too much," likely to be on the same level of conviction as Brooks' report, in the records, that "she likes sex too much." An attenuated comment sel-

dom makes a direct comment cumulative. "The excluded evidence was in fact the strongest evidence." *Lewis v. Wilkinson,* 307 F.3d 413, 422 (6th Cir.2002).

Thus, the excluded evidence was, "otherwise admissible under these rules," referring to the KRE 403 test referenced within KRE 412(b)(2).

**D. Does the excluded evidence's probative value substantially outweigh the danger of harm to the victim and of unfair prejudice to the other party under KRE 412(b)(2)**

### i. Balancing

 "'Unfair prejudice' means the *undue* tendency to suggest a decision based on improper consideration; it 'does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence.'" *Doe v. Claiborne County, Tenn. By and Through Claiborne County Bd. of Educ.,* 103 F.3d 495, 516 (6th Cir.1996) (*quoting United States v. Bonds,* 12 F.3d 540, 567 (6th Cir.1993)) (emphasis in original). "Evidence is unfairly prejudicial only if ... it 'appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish,' or otherwise 'may cause a jury to base its decision on something other than the established propositions in the case.'" *Carter v. Hewitt,* 617 F.2d 961, 972 (3d Cir.1980) (*quoting* Fe. R. Evid. 403 advisory committee's note). "[U]nfair prejudice is that which is unnecessary and unreasonable." *Partin v. Commonwealth,* 918 S.W.2d 219, 223 (Ky.1996) *rev'd on other grounds by Chestnut v. Commonwealth,* 250 S.W.3d 288 (Ky.2008).

Since Brooks is both the victim and the other party opposing the evidence, both tests must be applied with her in mind. And "[w]e must look at the evidence in the light most favorable to its proponent, 'maximizing its probative value and minimizing

its prejudicial effect.'" *Sutkiewicz v. Monroe County Sheriff*, 110 F.3d 352, 360 (6th Cir.1997).

### ii. Probable Value

■ The probative value of evidence is measured by the strength of its tendency to prove one side or the other of a material issue in the case. Direct evidence is often stronger in value than circumstantial, but that which is most convincing, or proves to be the more conclusive, or finally pushes the strength of one's case to a conclusive level on a material issue of fact, is entitled to the strongest probative value.

In *Barnett v. Commonwealth*, 828 S.W.2d 361, 363 (Ky.1992), we stated:

> The purpose of the Rape Shield Statute[, then KRS 510.145,] in generally prohibiting evidence of prior sexual conduct of a complaining witness is to insure that that witness does not become the party on trial through the admission of evidence that is neither material nor relevant to the charge made. The statute does not prohibit the introduction of relevant, probative evidence at trial, if the evidence of prior sexual conduct directly pertains to the [act] with which the defendant is charged.

*Id.* at 363. In *Barnett*, the Commonwealth offered the testimony of an examining physician who testified to findings of chronic sexual contact in regards to the young female victim and identified the appellant as the perpetrator of such contact. Yet, "[d]espite the existence of several handwritten notes by the [youthful] victim and her brother which suggested the existence of a sexual relationship between them, and statements by the victim identifying her brother as one with whom she had sexual contact, the trial court denied appellant any right to cross-examine the complaining witness or her brother as to their possible sexual contact." *Id.* at 362.

In reversing, this Court stated:

> In the case of a sexually active adult who claims to be the victim of rape, medical findings that she frequently engages in intercourse would not be probative of the crime charged. However, in the case of a female child who is presumed not to be sexually active, and with whom any sexual contact is prohibited, a medical finding of frequent sexual activity establishes the relevance of evidence that the perpetrator is one other than the person charged.
>
> . . . .
>
> Omission of the evidence concerning the ongoing sexual activity between the complaining witness and her brother was devastating to appellant in light of the testimony of the examining physician who expressed findings of chronic sexual contact and, without objection, identified appellant as the guilty party. The possibility that the victim had engaged in ongoing sexual conduct with her sibling was not revealed to the physician during his examination and interview of the victim. This revelation may have caused the physician to qualify or omit his branding of appellant as the assailant.

*Id.* at 363. Thus, "[a]ppellant was required to defend himself without the benefit of evidence which could have explained the expert's ... findings. The preclusion of the evidence of the victim's sexual contact with her brother was tantamount to a denial of appellant's right to present a defense." *Id.* at 363.

*Anderson v. Commonwealth*, 63 S.W.3d 135 (Ky.2001), involved similar circumstances where the excluded testimony was critical to the right to a defense. Again, the victim was a child and unlikely to have sexual partners. The only partner identified was the appellant.

Therefore, testimony from a doctor that C.S.B. had a "loose vaginal opening"

would lead the jury to believe that Appellant must have been the one who penetrated C.S.B. and caused her vaginal opening to be loose. Therefore, under *Barnett*, it appears that the evidence of the victim's past sexual encounter is relevant to provide an explanation for why she had a loose vaginal opening, and rebut the inference of guilt.

*Id.* at 140.

*Young,* 182 S.W.3d at 224, involved a defendant charged with rape who filed a motion pursuant to KRE 412 to be allowed to introduce evidence that (1) the alleged victim made statements to her co-worker "that she wanted to engage in sex with the defendant to such a degree that it would melt the ice in the water cooler" and also commented, in reference to the defendant, "that she 'wanted some of that,'" and (2) that the alleged victim frequented the police department where he was working at night and flirted or made sexual advances directed at him. Young's entire defense to the charge of first-degree rape was that the sexual encounter was consensual. *Id.* at 224. The trial court sustained the motion to allow admission of the offered evidence and granted a continuance for the Commonwealth's interlocutory appeal. On appeal, the Court of Appeals affirmed, stating:

> This is a case which hinges solely on the credibility of the prosecuting witness and Young. There is no medical evidence since the alleged rape was not reported for months. Excluding the evidence as the Commonwealth desires would be tantamount to denying Young his constitutional right to present a defense of consensual sexual contact.

*Id.* at 224–25.

*Judd v. Rodman,* 105 F.3d 1339 (11th Cir.1997), is also instructive as to probative value in regards to past and present sexual activities in a civil action for damages. In *Rodman,* Judd sued Rodman for damages,

claiming he gave her herpes. On Judd's appeal, after a trial verdict in favor of Rodman, she contended that, "under the balancing test of Rule 412(b), evidence of her prior sexual history should have been excluded because its probative value failed to outweigh substantially the unfair prejudice toward her." *Id.* at 1343. In upholding its admission, the court held:

> A central issue of the case, however, is whether Judd contracted genital herpes from Rodman. Expert testimony revealed that the herpes virus can be dormant for long periods of time and the infected person can be asymptomatic. Consequently, evidence of prior sexual relationships and the type of protection used during sexual intercourse was highly relevant to Rodman's liability. The court did not abuse its discretion in admitting evidence of Judd's prior sexual history.

*Id.*

*Delaney v. City of Hampton,* 999 F.Supp. 794 (E.D.Va.1997) involved similar circumstances. In *Delaney,* the court found that such evidence should be available to the jury, noting:

> It is clear from Delaney's psychiatric file that she has had numerous stressors in her life besides the alleged incident with Parker including a history of sexual abuse and other incidents such as an automobile accident. The City has experts who will testify that these stressors may have contributed to her current psychiatric problems. Therefore, evidence of such past abuse that is found in Delaney's psychiatric medical file should be admitted in this case.

*Id.* at 796.

Here, evidence that the sexual activity—which admittedly occurred—was so quiet that Brooks' sleeping roommate was not awakened and the nearby nurses' station never heard any activity, sets the stage for

a significant factual issue for the jury as to whether or not the sexual activity was consensual or non-consensual. Moreover, Brooks' comments to Dr. Gibson that she "had sex in the hospital," as opposed to having been "raped" in the hospital, could be taken by the jury as strongly suggestive of consensual sex. Consistent with this point, her failure to report being "raped" during her admission and treatment is highly relevant on this same issue.

In addition, Dr. Lisa Goodman was allowed to testify as plaintiff's expert regarding a hypothetical damage theory based on the consequences of an actual rape. She gave opinions which were based upon damage that a rape could cause an average victim. Though Dr. Goodman never saw, evaluated or diagnosed Brooks, she was allowed to testify that Brooks "was raped." Thus, evidence that "she liked sex too much" and "had been sexually promiscuous and had unprotected sex with numerous men and with at least one woman" and had reported conflicted feelings in regards to her sexual promiscuity, that she believed she was bi-sexual and that these, along with the state of her resulting mental and emotional health, which were the reasons for her admission to Ten Broeck, are strongly relevant to the issue of damages.

In addition, Brooks' mother's report that Brooks had been molested at age fourteen (14) by her father and that her many sexual relationships caused her to express feelings of shame, guilt and lack of self-esteem, all strongly relate to the issue of damages. Clearly, any damage she was suffering prior to the time of the sexual event of January 5, 2001, was highly relevant to the question of what damages she suffered as a result of the event. Thus, in the balancing required under KRE 412(b)(2), the probative value of the evidence excluded would necessarily be high when weighed in regards to the appropriate issues of consent and damages.

### iii. Weighing the danger of harm and unfair prejudice to Brooks

In *Wilson v. City of Des Moines*, 442 F.3d 637 (8th Cir.2006), a sexual harassment suit, the court allowed into evidence sexually charged comments made by the plaintiff in the work place. Testimony was also allowed that the plaintiff used "lewd, rude and unlady-like language in the workplace." *Id.* at 643. The evidence was allowed on the basis that the plaintiff "might have welcomed the alleged harassment." The admission of such evidence was affirmed on appeal, wherein the court noted:

> While we agree that the district court erred in mischaracterizing this evidence as non-Rule 412 evidence in the first instance, there was no danger of harm or prejudice to [the plaintiff] or any other party, and the district court correctly determined that it was admissible as relevant to the issues raised by [the plaintiff's] claims.

*Id.*

In another sexual harassment suit, *Hall v. Transit Authority of Lexington–Fayette Urban County Government*, 883 S.W.2d 884 (Ky.App.1994), the court allowed evidence of the plaintiff's extra-martial affair with a co-worker. In affirming admissibility, the court noted:

> If an employee made a claim for damages based upon a physical trauma allegedly suffered in the workplace, any prior or contemporaneous complaints relating to other causes of the alleged injury would most certainly be relevant. The same reasoning applies to injuries resulting from non-physical traumas such as sexual harassment. Evidence of other factors that possibly contributed to [the plaintiff's] emotional injuries are

clearly relevant to the issue of damages in this case.

Id. at 887.

■ Thus, considering Brooks' Ten Broeck medical records during the term of her treatment within the context of the issues raised by the evidence, particularly in regards to the issues of consent and damages, we find no *unfair* prejudice. To the extent the jury finds the sexual event to have been non-consensual, it is unlikely that the evidence contained within the records dealing with her sexuality would suggest a decision on any improper basis. Were the jury to find the sexual event was consensual, then the damage to Brooks' case would be by virtue of the consent rather than the evidence of the medical records. Moreover, a trial court can, concurrent with the introduction of the evidence, give such admonitions to the jury as it deems proper to avoid any untoward use of the evidence. *See Wilkinson*, 307 F.3d at 422 ("The court could minimize any danger of undue prejudice by admitting the evidence with a cautionary instruction.").

■ We must also consider "the danger of harm" to the victim. KRE 412(b)(2). This test is, however, more objective than subjective, and must relate to potential actual harm of a physical, emotional or mental nature, as opposed to the unfair prejudicial affect one would assess upon behalf of a party. Thus, this test is separate from that of unfair prejudice. Yet, the measurement of this danger of harm to the victim, like that of "unfair prejudice," may not transcend a party's right to a fair defense. *See Wilkinson*, 307 F.3d at 422 ("The constitutional violations in this case are significant enough to outweigh any violation of the rape shield law, whose purposes can be served by the instructions of the trial court."). Conversely, the closer one gets to damaging a party's right to cross-examining a critical witness and presenting a defense, the higher the probative value of the evidence being considered for exclusion. *Id.* at 419–21.

Considering the objective circumstances, we recognize that Brooks entered Ten Broeck for treatment stemming from her past sexual history and the mental and emotional turmoil and injury created thereby. We note from Ten Broeck's records that Brooks' discharge summary of January 20, 2001, states she felt "100% better" than when she was admitted, that the group sessions had helped her, and that she had done well on her treatment. Her principal concerns upon discharge were that she might be bi-sexual and she was concerned about how her boyfriend might react to this. She noted this condition "stresses her." Moreover, the fact of the trial itself—and we are not unmindful of her tearful testimony—generated stressful, and emotional conditions for her.

■ Yet, to the extent the evidence discussed herein is true, it is a truth she has lived with for some time. To the extent that it is not true, one would expect it would generate anger, which one would expect to be fleeting. It is not evidence, which if disclosed at trial, would cause someone to want to hurt her. In reviewing a trial court's decision to admit or exclude evidence in this regard, the proper standard of review is an abuse of discretion. Thus, from a consideration of the evidence excluded and the relationship of this evidence to the other evidence of the case, we cannot place a value on the danger of harm to Brooks that would overcome the substantial need of Appellant for the probative value of the excluded evidence. We thus conclude that the probative value of the excluded evidence substantially outweighs the danger of harm and unfair prejudice to Brooks.

■ Accordingly, we hold that the trial court abused its discretion in excluding Brooks' Ten Broeck hospital records during her treatment period, as well as, the other evidence of her sexual history as discussed herein, excepting, however, Brooks' statement in her deposition that she had sex with one-hundred (100) men and one woman. This last statement should remain excluded for reasons that Brooks' Ten Broeck medical records already note that she stated "she had been sexually promiscuous and had unprotected sex with numerous men and with at least one woman." Once sufficient evidence is introduced on a particular point, the KRE 403 and 412(b)(2) balancing considerations may shift to protect against unnecessary and unfair repetition designed solely to place a victim in a bad light.

We note Brooks' argument that KRE 412(c) requires the defendant to file a written motion at least fourteen (14) days before trial specifically describing the evidence sought to be admitted for the purposes for which it is offered. However, two separate motions were filed by Ten Broeck seeking the admissibility of this evidence, both before, and after, the 2003 Amendment adding KRE 412(b)(2), and that Ten Broeck requested an evidentiary hearing, which the court improperly denied. Nor, do we consider the evidence to have involved evidence of reputation as argued by the Appellant. We find these arguments without merit.

Moreover, having found error in the exclusion of the stated evidence, we cannot under the facts of this case, find it to be harmless. We therefore reverse and remand for a new trial. To the extent they are preserved and are capable of repetition, we will also address other issues raised.

## II. The testimony of Nurses DeBroy and Reed and Detective Jeffrey concerning conduct of Ten Broeck's employee, Gilbert, was admissible

St. Matthews Police Detective Brad Jeffery, who at the time was investigating an alleged, unrelated rape of another Ten Broeck patient by a fellow patient, testified that in November or December of 2000 he told the attorney retained by Ten Broeck to represent it in the investigation, that he had information about "some more problems at the hospital on the adolescent side." Detective Jeffrey then told the attorney that an employee named Gilbert, that worked on the adolescent wing, had "perped" some young female patients. Detective Jeffery defined "perping" as the act of a sexual predator to lure or prime a victim sexually before the sexual predator attacks. Jeffery received the information from a hospital employee.

Detective Jeffery's information was reported by the attorney to Ten Broeck's risk manager, Sherrie Greenhill. Thereafter, Detective Jeffery was informed by the attorney that Ten Broeck had no employee by that name and was unaware of any such problem. Ten Broeck objected to Detective Jeffery's testimony on grounds of hearsay.

Likewise, Ten Broeck objected on the same grounds to the following testimony of Anita DeBroy, Ten Broeck's charge nurse for the 11:00 p.m. to 7:00 a.m. shift:

1. That Gilbert had rubbed a patient's leg and asked the patient if she was "wild." DeBroy noted that it wasn't reported directly to her, it was reported to somebody on dayshift. She couldn't remember who it was reported to, but Nancy Reed, a nurse, may have been the person on dayshift that received the complaint from the patient. There was a report made about it and an investigation. Subsequent to the investigation, hospital procedures changed. After

that, both a male and female were required to go into patient rooms together to take a patient's vital signs.

2. Gilbert told her that he had read a young lady's diary one night when he was working in the children's unit and then "gone back later on and told her that he had read her diary. And that was reported also."

3. She had heard of an alleged patient on patient rape in the hospital. Supposedly, the man who committed the alleged rape, William Cole, was sent to KCPC, but she was there that night, and didn't actually believe it happened because she saw him all night long in his room. There was, however, a roommate that said she had observed it, but the roommate was preoccupied with people being raped, and the account she gave of the event, "was the same identical account that she gave of another lady that had previously been her roommate, being raped by the same patient. So whether she was a good historian telling you a great story or not would be questionable because of her delusions."

4. That she was aware of two staff members that were terminated for sleeping on the unit during their work hours.

5. She had heard rumors that a former female staff member allegedly had sexual relations with a former patient after the patient's discharge. That staff member was reprimanded for her behavior and eventually was fired. This alleged sexual activity occurred after the alleged sexual assault on Brooks.

In addition, DeBroy testified that Gilbert would regularly make sexual comments and engage in inappropriate sexual conduct. In fact, she discussed Gilbert's inappropriate behavior and sexual comments with her co-workers. On one occasion, Gilbert told her that he liked to watch a particular female walk down the hall—

and "to watch how her butt bounces." According to her, Gilbert engaged in a lot of sexual talk. She also noted that various incidents were reported before Brooks became a patient:

Q: Is it fair to say that this type of sexual talk occurred on numerous occasions by him?

A: That's fair to say, yes.

Q: And is it fair to say that it would have occurred on numerous occasions before Artemecia Brooks was a patient in this facility?

A: Yes.

Q: And is it fair to say that those incidents were reported on each occasion to someone in administration?

A: To my knowledge they were reported.

DeBroy also testified that she was short-handed on the evening the rape allegedly occurred and so—informed her supervisor, Larry Koebel. Koebel told her to simply redistribute existing employees. DeBroy believed the Gilbert/Brooks incident occurred the same night she complained to Koebel that the staff was short-handed.

Ten Broeck also objected to the following testimony of Nancy Reed, Ten Broeck's supervisor of mental health associates, to wit:

1. That another mental health associate told her that a patient, whose identity she did not know, allegedly claimed that Gilbert had rubbed her leg.

2. That another employee, Regina Kirkpatrick, had said she had reported the incident to nurse managers, John Bisig or Larry Koebel.

In addition, Ms. Reed testified that the person who reported the "leg rubbing incident" was a patient. As a supervisor, she testified the information needed to be reported to the staffing nurse managers, Bisig and Koebel. She admitted the nursing staff needed to watch for such things and report them. She discussed it with the

associate who made the report and was advised that Larry Koebel already knew. She was told that the incident was reported and that it would have been before the alleged assault on Brooks. She testified that she was so concerned about Gilbert's conduct that she told co-workers to "watch out for him."

Appellant's objections to the above testimony on the grounds of hearsay were overruled by the trial court.[4] Ten Broeck argues that the statements made by these witnesses are "hearsay" or "double hearsay." It asserts that "double hearsay" is automatically precluded by the Kentucky Rules of Evidence. KRE 805, however, provides that "double hearsay" is "not excluded under the hearsay rule if each part of the combined statements conforms with an exception" to the rule. KRE 805, however, like other hearsay rules, has no application to non-hearsay. Thus, "there would be no need for a second exception if [a] statement had one layer of hearsay and [one] layer of non-hearsay." Lawson, *Supra* § 8.90[3].

The majority of the testimony was offered by Brooks to show that Ten Broeck had, through its staff, received numerous complaints from patients and staff regarding Gilbert's conduct for purposes of the negligent hiring/retention claim.[5] Moreover, the staff testified the statements had been reported.

When viewed in such context, the statements are not hearsay. *See Jones v. Heady*, 553 S.W.2d 288, 290 (Ky.App.1977) (Statement not inadmissible hearsay when offered to show knowledge); *see also Brewer v. Commonwealth*, 206 S.W.3d 343,

351 (Ky.2006) ("[T]he statements are not hearsay evidence because they are 'not admitted for the purpose of proving the truth of what was said, but for the purpose of describing the relevant details of what took place.' "); *Marshall v. Commonwealth*, 60 S.W.3d 513, 521 (Ky.2001) (statements which show knowledge are not hearsay because they are not offered to proof the truth of the matter asserted.). Here, knowledge of the complaints, whether ultimately true or not, was highly relevant to Ten Broeck's duty to investigate the conduct of Gilbert.

However, even assuming the statements made by the employees required secondary hearsay exceptions, they fall within KRE 801A(b)(4). KRE 801A(b)(4) provides:

> Admissions of parties. A statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the statement is offered against a party and is:
>
> . . . .
>
> (4) A statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship; or

Here, the statements made by Ten Broeck's nurses were within the scope of their employment as they concerned the interaction of staff with patients at Ten Broeck's facility. They were received and were required to be reported due to their employment. Accordingly, KRE 801A(b)(4) would apply.[6] KRE 801A(b)(4) is the Kentucky counterpart to Fed. R.Evid. 801(d)(2)(D). *See Fields v. Com-*

---

4. The trial court admitted most of the statements under KRE 801A(b)(4), i.e., "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."

5. Some of the other statements were relevant to Ten Broeck's practice and ability to investigate incidents, as well as discipline employees.

6. Ten Broeck also references the Confrontation Cause in its brief and suggests that con-

*monwealth*, 905 S.W.2d 510, 512 (Ky.App. 1995). The commentary to the Federal Rule notes Fed.R.Evid. 801(d)(2)(D)—and thus, KRE 801A(b)(4) by analogy—literally takes certain types of hearsay statements out of hearsay consideration under the premise or theory that they should be admitted in a adversary system. Fed. R.Evid. 801(d)(2)(D) advisory committee's note. The commentary stresses that such evidence should enjoy freedom from the "technical demands of searching for an assurance of trustworthiness" in satisfaction of the hearsay rule and should be generously admitted. *Id.* Rather, the appropriate manner for testing the reliability of admissions by agents is to apply "the usual test of agency," in determining if the admission was made in the scope of employment. *Id.*

▮▮▮▮ Moreover, communications by patients regarding their medical care, or complaints of staff misconduct, are an important and necessary aspect of a medical care provider's ability to monitor and upgrade its medical care. Thus, there is a social policy which both protects and encourages the free communication of such reports and/or complaints. When made, they are evaluated by the receiving staff, and if found to be of concern, the report is, or should be, passed on for appropriate investigation. Here, both Nurse DeBroy and Reed testified the patient complaints were reported. Several were acted upon. This action manifested an adoption or belief in the truth of the report/complaint of the patient. Thus, the patient complaints or statements which were acted upon by Ten Broeck, are not excluded by the hearsay rule, as it was offered against Ten Broeck and is "[a] statement of which the

party has manifested an adoption or belief in its truth." KRE 801A(b)(2); *see also Pilgrim v. Trustees of Tufts College*, 118 F.3d 864, 870 (1st Cir.1997) ("Adoption or acquiesce may be manifested in any appropriate manner") (*abrogation recognized on other grounds* in *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 406 (1st Cir.2002)); *see also Wright–Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1268 (10th Cir. 1998) ("A statement is adopted to the extent the adoptive party accepted and acted upon the evidence."). However, the burden of showing the manifestation is on the party offering the evidence. *Cf. Ricciardi v. Children's Hosp. Medical Ctr.*, 811 F.2d 18, 24 (1st Cir.1987).

▮▮▮▮ In *Pilgrim*, the president of Tufts College, received and acted upon a committee's report of grievance and recommendations. Thus, its "acceptance of the contents of the Report and [its] implementation of its recommendations, without disclaimer, served as an adoption of the Report for the purposes of [KRE 801A(b)(2) ]." *Pilgrim*, 118 F.3d at 870. There is no requirement that a " 'declarant have personal knowledge of the facts underlying [its] statement' for it to qualify as an adoptive admission." *Powers v. Coccia*, 861 A.2d 466, 470 (R.I.2004) (*quoting Brookover v. Mary Hitchcock Memorial Hospital*, 893 F.2d 411, 416 (1st Cir.1990); *Mahlandt v. Wild Canid Survival and Research Center, Inc.*, 588 F.2d 626, 630–31 (8th Cir.1978)).

Here, the reports and complaints of Ten Broeck's patients were received, evaluated and reported by its staff. In one instance, hospital procedures were changed to require the presence of both a male and a

stitutional rights might be implicated by the admission of the non-hearsay testimony. However, "[n]othing in *Crawford* [*v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, (2004) ] suggests that its reasoning was intended to apply where the Sixth Amend-

ment does not apply; and the Sixth Amendment does not apply to civil cases." *Cabinet for Health & Family Services v. A.G.G.*, 190 S.W.3d 338, 345 (Ky.2006) (*citing United States v. Zucker*, 161 U.S. 475, 481, 16 S.Ct. 641, 40 L.Ed. 777 (1896)).

female staff member to be in patient rooms when a patient's vital signs were taken, and in another, noted later, Gilbert was suspended, pending an investigation. This later event occurred just prior to his arrest. Thus, there is evidence establishing Ten Broeck's adoption by virtue of its acceptance and action upon these two complaints.

■ As noted previously, the standard of review of a trial court's evidentiary rulings is an abuse of discretion. *Tumey v. Richardson*, 437 S.W.2d 201, 205 (Ky. 1969). Here, the statements and complaints were testified to by Ten Broeck's staff and their receipt and reporting of such statements or complaints was within the scope and purpose of their employment. As the purpose of the testimony was to primarily show that the statements were made, they were properly admitted in regards to whether Ten Broeck should have investigated the matter prior to Brooks' injury. Moreover, those acted upon are admissible under KRE 801A(b)(2).

Nor can we find that the statements of the detective or staff were unduly prejudicial. KRE 403. Given the above, we find no abuse of discretion by the trial court in its ruling on these matters.

### III. Instructions in negligent hiring/retention claims

### A. The court's refusal to instruct the jury on the definitions of rape under Kentucky Law

Ten Broeck argues that the trial court's instructions, impermissibly imposed "re-spondeat superior" liability on it contrary to *Patterson v. Blair*, 172 S.W.3d 361 (Ky. 2005), as well as, erroneously precluded it from asserting the defense that Brooks was not raped. As to the former, Brooks asserts that the challenge to the "ordinary care" instruction was not preserved. Having reviewed the record, including the instructions tendered to the trial court by Ten Broeck, Ten Broeck's motion for judgment n.o.v., Ten Broeck's brief to the Court of Appeals, as well as its motion for discretionary review, we find that the objections and arguments made by Ten Broeck necessarily called into question the form of the instruction given and therefore this issue was preserved, although inartfully so.[7]

Throughout the trial, Brooks' counsel argued, and Brooks testified, that she was raped. Brooks' damage witness, Dr. Goodman, testified in general about the injuries suffered by women who are raped. Her testimony rested solely upon her research regarding damages sustained by women in the general population who have been raped. She never saw, evaluated or diagnosed Brooks. She noted she was not testifying as a clinician and had made only a cursory review of Brooks' medical records. Further, although she did not know the elements of rape under Kentucky law, she testified that Brooks was raped.

Ten Broeck objected to any characterization of the alleged assault as a "rape," or any reference to Brooks as a "victim of rape."[8] The court, in ruling upon Ten Broeck's objection, noted that Dr. Goodman used the term "rape," noted that the

---

7. In its motion for discretionary review, Appellant argued, "[t]he Court of Appeals at page 11 states that Ten Broeck is liable for its own negligence as Gilbert's alleged rape of Brooks is imputed to the hospital because it breached its standard of care *and* because it engaged in negligent hiring and retention. This raises another troubling public policy question regarding the standard to be imposed upon the hospital which is seminally at odds with this court's decision in *Patterson v. Blair* [172 S.W.3d 361 (Ky.2005)]."

8. Gilbert was acquitted of the alleged rape in his criminal trial.

jury may have some "non-legal" view of what rape is and determined that as long as the jury heard what the expert said, the court would not exclude use of the term "rape." However, during the later instruction conference, Brooks' counsel argued that it made no difference whether Brooks was raped, because Gilbert admitted he had intercourse with Brooks. No instruction concerning (or defining) "rape" or "sexual assault" was given.

 Consensual sex, however, was Ten Broeck's factual, if not legal, defense to Brooks' claims of liability and damages. "[R]ape, one of the most aggravated batteries, is, if the woman consents, neither rape nor even assault." *Goldnamer v. O'Brien*, 98 Ky. 569, 33 S.W. 831, 17 Ky. L. Rptr. 1386 (1896) ("Thus, a woman who immorally yields to her seducer cannot sue, because she consented to and participated in the wrong whereof she complains."). Therefore, consent if valid under the circumstances, is a defense to sexual assault, or said more appropriately, "[l]ack of consent is an essential element of [the] battery [constituting the sexual assault.] Therefore, the absence of consent must be proved as a necessary part of the plaintiff's case." *Vitale v. Henchey*, 24 S.W.3d 651, 658–659 (Ky.2000). The consent, however, "must be knowingly and intelligently given and may not be the result of . . . incompetence." 6A C.J.S., Assault § 22 (2008); *see Koch v. Stone*, 332 S.W.2d 529, 531, 532 (Ky.1960); *see also* KRS 510.020(3).

 "The basic function of instructions in Kentucky is to tell the jury what it

must believe from the evidence in order to resolve each dispositive factual issue in favor of the party who bears the burden of proof on that issue." Palmore, *Kentucky Instructions to Juries*, Vol. II § 13.01 (5th ed.) (*citing Webster v. Commonwealth*, 508 S.W.2d 33, 36 (Ky.1974)). And "[i]t is the duty of the court to furnish a criterion for the measurement of damages." *Kentucky Utilities Co. v. Consolidated Tel. Co.*, 252 S.W.2d 437, 441 (Ky.1952). Thus, an instruction is erroneous if it assumes or has the appearance of assuming an essential fact concerning disputed evidence. *Conley v. Foster*, 335 S.W.2d 904 (Ky.1960).

 Here, the court gave two (2) liability instructions, Instruction No. 3 and No. 4.[9] Instruction No. 3 was premised upon a general duty of ordinary care. As we discuss this instruction at more length in Argument IIIB, we will not consider it further in regards to this issue, other than to note that to find for Brooks thereunder, the jury was only required to find that "the Defendant failed to comply with [the duty of ordinary care expected of reasonable and prudent hospitals acting under similar circumstances] and that such failure on [Ten Broeck's] part was a substantial factor in causing injury to [Brooks]."

Instruction No. 4 read as follows:

It was the duty of Defendant, Ten Broeck Hospital, acting by and through its employees, to exercise ordinary care in hiring Feotis Gilbert as an employee or in retaining Feotis Gilbert as an employee when they knew or should have known that he was unsuitable for the position for which he was hired.[10]

**9.** No issue of apportionment was argued to this Court.

**10.** Although, we have not been asked to consider this entire instruction, we would be remiss not to express concerns on retrial as to the potential effect of the word "when," as compared to, "when and if." Moreover, the word "unsuitable," by itself, insufficiently re-

flects the level of foreseeability required for liability in these instances, i.e., "whether [the employer] knew, or reasonably should have known, that (1) [the employer] was unfit for the job for which he was employed, and (2) whether his placement or retention in that job created an *unreasonable risk of harm* to [another]." *Oakley v. Flor-Shin, Inc.*, 964 S.W.2d 438, 442 (Ky.App.1998) (emphasis

If you are satisfied from the evidence that Defendant, Ten Broeck Hospital, failed to comply with that duty and that such failure on their part was a substantial factor in causing injury to [Brooks], you will find for the Plaintiff, [Brooks], and against the Defendant and proceed to Verdict Form A; otherwise you should proceed directly to Verdict Form B.

In that the jury verdict did not reference which of the two instructions the jury found liability under, we are unable to ascertain with certainty their findings by which to resolve the issues of consent and damages.[11] Absent a finding of sexual assault (i.e., the rape), meaning it was nonconsensual, we cannot find support in the evidence for the damages awarded, since Dr. Goodman's testimony regarding damages hinged upon the occurrence being rape. Although Ten Broeck's liability under Instruction No. 4 is properly premised upon its own negligence in the "hiring or retention" of Gilbert, the compensatory damages therefore must, in some form, be a measurement of the victim's injuries from the employee's acts. And, were it consensual, there could be no sexual assault.

"In order for [an] employer to be held liable for negligent hiring [or] retention . . . the employee must have committed a tort." *Mulhern v. City of Scottsdale*, 165 Ariz. 395, 799 P.2d 15, 18 (1990) (citations omitted). The underlying tort may be intentional, such as a sexual assault, or negligent, such as a breach of care. *Cf. Flor–Shin, Inc.*, 964 at 438; *see also Lexington Hospital v. White*, 245 S.W.2d 927, 929 (Ky.1952) ("It is not questioned that a private hospital . . . receives patients un-

der an implied obligation to exercise ordinary care and attention for their safety, and that such degree of care and protection should be in proportion to the physical and mental ailments of the particular patient.").

But, whether an intentional sexual assault, or consensual sexual encounter, will support an action in negligence against a party based upon the breach of a professional standard of care is a question that has yet to be answered in this state. A sexual assault, however, is a battery and we have noted that "[b]attery is an intentional tort; it is not committed by a negligent act." *Vitale*, 24 S.W.3d at 656. (citation omitted). Several states, however, have answered the question. *See* Russell G. Donaldson, J.D., Annotation, *Liability of Hospital or Clinic for Sexual Relationships With Patients by Staff Physicians, Psychologists, and Other Healers*, 45 A.L.R.4th 289 (1986); *see also* Brendan de R. O'Byrne, B.A. LL.B., Annotation *Civil Liability of Doctor or Psychologist for Having Sexual Relationship with Patient*, 33 A.L.R.3d 1393 (1970); Phoebe Carter, J.D., Annotation, *Employer's Liability for Assault, Theft, or Similar Intentional Wrong Committed by employee at Home or Business of Customer*, 13 A.L.R. 5th 217 (1993).

In *McCracken v. Walls–Kaufman*, 717 A.2d 346, 353 (D.C.1998), the court found the physician could be liable in tort for medical malpractice for engaging in sexual acts with his patient, if such conduct was established as a breach of the applicable standard of care. However, the court also noted, "[c]onsent to the sexual acts, freely and competently given, would be a defense

added). The level of foreseeability required is more approximately reflected by substitution of the words "dangerously unsuitable." See also Palmore Kentucky Instruction to Juries Civil § 22.02, 28.07 (5th ed.)

11. The verdict forms were not drafted in a manner to disclose which liability instruction the jury found under.

to such a theory of liability. Whether a particular plaintiff is capable of consenting to such a relationship is a question of fact to be determined at trial." *Id.* at n. 4.

In *Gunter v. Huddle,* 724 So.2d 544, 546 (Ala.Civ.App.1998), the plaintiff alleged that her affair with the physician "occurred 'within the shadow of [a] professional relationship,' and, therefore, that it constituted malpractice." *Id.* In upholding the dismissal of the plaintiff's claim, the court held

> We likewise adhere to the majority rule ... and hold that where, as here, a patient of a nonpsychiatric physician does not present evidence that he or she was led to believe by that physician that the sexual relationship was part of the patient's treatment, a sexual relationship between the patient and the physician is outside the scope of the physician's professional services and does not constitute professional malpractice.

*Id.; see also N.X. v. Cabrini Medical Center,* 280 A.D.2d 34, 719 N.Y.S.2d 60, 64 (N.Y.A.D. 1 Dept.2001) ("In our view, no amount of legal rhetoric can ever transform the heinous act committed by Dr. Favara into anything other than what it was—a sexual assault. Moreover, no amount of rhetoric can obscure the dissent's failure to explain how a sexual assault furthers a hospital's business as a medical care provider.").

In *Hoopes v. Hammargren,* 102 Nev. 425, 725 P.2d 238, 242 (1986), the plaintiff claimed that the physician used the physician-patient relationship to induce her into a sexual relationship and that such conduct constituted malpractice. Recognizing the physician-patient relationship as "fiduciary in nature," the court held that taking "[s]exual advantage of the physician-patient relationship can constitute malpractice." *Id.* at 242. In explaining its holding, however, the court noted:

> The nature and extent of the circumstances surrounding the alleged exploitation must be carefully examined. For example, we will not presume that Ms. Hoopes was incapable of giving consent. The sexual relationship which admittedly existed could have been personal and unrelated to the parameters of treatment.... We also caution that Ms. Hoopes not only is required to prove exploitation, but also that it was the proximate cause of any claimed harm.

*Id.* at 243.

*Zuidema v. Pedicano,* 373 N.J.Super. 135, 860 A.2d 992 (2004) dealt with both medical malpractice and sexual assault. Here, the allegation supporting both claims was that the plaintiff was sexually assaulted in the physician's office. The jury found that the plaintiff "did not show by a preponderance of the evidence that [the physician] assaulted and battered her. However, the jury unanimously found that [the physician] was medically negligent." *Id.* at 997. In its consideration, the court further noted, that "[w]hether the verdict could be considered a finding by the jury that [the physician] and Zuidema had a consensual sexual relationship was not resolved. The trial judge did comment in passing that the incident may have been consensual." *Id.* at n. 4. Thus, the court reversed the jury's verdict, holding:

> Simply stated, sexual relations between a physician and patient are certainly not condoned, but [the plaintiff] may not utilize a medical malpractice type theory to support a claim based on an intentional act independent of a physician's practice, or for a claim of sexual assault. The jury found that there was no sexual assault, thus rejecting this claim, and the jury incorrectly considered a medical negligence issue because it was improp-

erly based on an intentional act. Thus, we reverse the jury's verdict.

*Id.* at 1000 (citation omitted).

In its commentary, the court also noted that "[t]here is no reported case that we are aware of that has allowed any form of negligence to be proven by a sexual assault, an intentional act." *Id.* at 998. Also, in *Fragosa v. Haider,* 17 A.D.3d 526, 793 N.Y.S.2d 161, 162 (N.Y.A.D. 2 Dept. 2005), the court held, "[t]he complaint does not state a cause of action alleging medical malpractice. The injuries as asserted in the complaint stemmed from the alleged intentional assault by the [plaintiff], not the medical services rendered."

Yet, in *Bunce v. Parkside Lodge of Columbus,* 73 Ohio App.3d 253, 596 N.E.2d 1106, 1111 (1991), the plaintiff, while a patient in a drug and alcohol rehabilitation facility for treatment of her cocaine addiction, engaged in a sexual relationship with a senior counselor at the facility. She later filed suit against the facility and the counselor, alleging among other claims, sexual assault and malpractice. In upholding her right to proceed under the theory of malpractice, the court held:

> Maintenance of a malpractice claim does not rely upon the question of whether [the plaintiff] validly consented to the sexual contact but upon the possible breach of a duty owed her by [the counselor]. It is axiomatic that, although consent would be a valid defense to a criminal charge of sexual assault or rape, consent is not a defense to a malpractice claim based upon sexual contact. Malpractice involves the breach of a professional duty; where the duty itself is to refrain from sexual contact, consent would not excuse the breach. The action for malpractice arises out of

"[ ]a public policy to protect a patient from the deliberate and malicious abuse of power and breach of trust by a [therapist] when that patient entrusts to him her body and mind in the hope that he will use his best efforts to effect a cure. [ ]"

*Id.* at 1111 *citing Roy v. Hartogs,* 81 Misc.2d 350, 366 N.Y.S.2d 297, 301 (1975) *(rev'd on other grounds* 85 Misc.2d 891, 381 N.Y.S.2d 587 (1976)).

Aside from the question of whether an intentional sexual assault may support an action against an employee for negligent breach of the duty of care, and thus a claim against the employer for negligent hiring/retention, we either had a sexual assault, or we did not. The proof of damages was, to a great extent, dependant upon it. The determining factor is consent, a critical factual question not presented to the jury by the instructions. Thus, Gilbert's underlying act was ignored by Instruction No. 4, which focused only on Gilbert's "unsuitability" for the job, Appellant's knowledge of such "unsuitability," and whether Appellant's hiring or retention of Gilbert was "a substantial factor causing injury to [Brooks]." *Flor–Shin* does not support such a narrow instruction. 964 S.W.2d at 438.

In *Flor–Shin,* the victim sued both the tortfeasor and the employer. Thus, at trial, the instructions would have presented the jury with the requirement of finding the sexual assault prior to consideration of the employer's liability.[12] Therefore, unlike here, the issue of consent would have been addressed.

■ Here, since the evidence concerning whether or not the event constituted a sexual assault, or consensual sex, was dis-

---

12. The assailant in *Flor–Shin* had previously pled guilty to several crimes constituting sexual assault. Thus, even had the court directed a verdict of liability for the victim against the assailant, the issue of consent would have been properly addressed. In this instance, Gilbert was acquitted.

puted, the court's failure to give an appropriate instruction under the negligent hiring/retention claim, from whence the jury could make a finding as to whether a "sexual assault" was committed by Gilbert, was error. There must be a finding of a tort to support liability and damages under a theory of negligent hiring/retention.[13] "A party to civil litigation is entitled to have his theory of the case submitted to the jury for its acceptance or rejection if there is any evidence to sustain it." *Risen v. Pierce,* 807 S.W.2d 945, 947 (Ky.1991). This was not the case in this instance and it was error.

Upon retrial, should the evidence be substantially the same, the jury should be able to make findings regarding Gilbert's alleged sexual assault of Brooks. Only then may it consider and make findings against Ten Broeck on Brooks' claim of negligent hiring/retention. Thus, on retrial, the court should, among others, instruct as follows:

### INSTRUCTION NO. _____

#### (Definitions)

Mental Illness—Means a substantially impaired capacity to use self-control, judgment or discretion in the conduct of one's affairs and social relations, associated with maladapted behavior or recognized emotional symptoms where impaired capacity, maladapted behavior or emotional symptoms can be related to physiological, psychological or social factors.

---

**13.** One could argue that the jury found under Instruction No. 3 *and* 4, and thus, the breach of ordinary care was the underlying tort. Yet, even were we disposed to approve of an "ordinary care" instruction in instances such as this, *see* section IIIB *infra,* given the record, such an argument would be speculative.

**14.** The definition of "incapable of appraising her conduct" is consistent with *Salsman v.*

Mentally Incapacitated—Means that a person is rendered temporarily incapable of appraising her conduct as a result of the influence of a controlled or intoxicating substance administered to her without her consent, or administered with her consent in a hospital or other medical care facility. The phrase incapable of appraising her conduct means that a person does not know that a sexual act will be performed.[14]

Ordinary Care—Means such care as a jury would expect an ordinarily prudent person engaged in the same type of business to exercise under similar circumstances.

Physically Helpless—Means that a person is unconscious or for any other reason is physically unable to communicate unwillingness to an act.

### INSTRUCTION NO. _____

#### (Duty of Care)

It was the duty of the defendant, Ten Broeck Hospital, acting by and through its employees, to exercise ordinary care in hiring or retaining Feotis Gilbert as an employee when and if, it knew, or should have known, that he was dangerously unsuitable for the position for which he was hired or retained.

### INSTRUCTION NO. _____(A)

#### (Liability)

You will find for the plaintiff Artemecia Brooks against the defendant, Ten

*Commonwealth,* 565 S.W.2d 638, 640 (Ky. App.1978). In addition, the definition of mentally incapacitated has been adapted to cover any issue concerning the potential effects of controlled substances delivered within hospital or medical care facility settings as arose from the evidence at trial. Such an adaptation is consistent with the fluctuating standard recognized in *White,* 245 S.W.2d at 929.

Broeck Hospital, under this instruction, if you are satisfied from the evidence that:

a. Feotis Gilbert engaged in sexual contact with Artemecia Brooks without her consent, expressed or implied; [15]

AND

b. That prior thereto, t he defendant, Ten Broeck Hospital knew, or reasonably should have known, that Feotis Gilbert was dangerously unsuitable for the position for which he was hired or retained as an employee;

AND

c. That Ten Broeck Hospital failed to comply with its duty of ordinary care in the hiring or retention of Feotis Gilbert as an employee;

AND

d. That such failure on the part of the defendant, Ten Broeck Hospital, was a substantial factor in causing injury to Artemecia Brooks; otherwise you shall find for the defendant, Ten Broeck Hospital, against the plaintiff, Artemecia Brooks, under this instruction.

### INSTRUCTION NO. ____(B)

#### (Liability)

If you do not find for the plaintiff, Artemecia Brooks, under Instruction No. ____(A), you will find for the plaintiff Artemecia Brooks against the defendant, Ten Broeck Hospital, under this instruction, if you are satisfied from the evidence that:

a. Feotis Gilbert engaged in sexual contact with Artemecia Brooks at a time when she was incapable of consent because she was mentally ill, mentally incapacitated or physically helpless,[16] of which he was, or should have been, aware; [17]

AND

b. That prior thereto, t he defendant, Ten Broeck Hospital knew, or reasonably should have known, that Feotis Gilbert was dangerously unsuitable for the position for which he was hired or retained as an employee;

AND

c. That Ten Broeck Hospital failed to comply with its duty of ordinary care in the hiring or retention of Feotis Gilbert as an employee;

AND

d. That such failure on the part of the defendant, Ten Broeck Hospital, was a substantial factor in causing injury to Artemecia Brooks; otherwise you shall find for the defendant, Ten Broeck Hospital, as against the plaintiff, Artemecia Brooks under this instruction.

### B. The Ordinary Care Liability Instruction

 An employer's liability under the doctrine of "respondeat superior" requires that the proximate cause of a plaintiff's injury must have been an act committed by an employee acting within the course and scope of his employment. *Pat-*

---

**15.** This is consistent with *Haywood v. Allen,* 406 S.W.2d 721, 722 (Ky.1966) ("Kentucky's highest court recognized that consent … need not be expressed, but may be implied from the surrounding facts and circumstances.").

**16.** The court should only instruct on those issues of mental capacity that are actually supported by evidence at retrial. *Cf. Burnett,* 31 S.W.3d at 881.

**17.** This concept of awareness is consistent with *Wilson v. Commonwealth,* 290 Ky. 223, 160 S.W.2d 649, 651 (1942).

*terson,* 172 S.W.3d at 366. An employee's scope of employment includes an intentional tort "committed by [an employee] where its purpose, however misguided, is wholly or in part to further the [employer's] business." *Id.* at 369. If, however, an employee

> acts from purely personal motives ... which [are] in no way connected with the employer's interests, he is considered in the ordinary case to have departed from his employment, and the master is not liable. This [sound] approach conforms to the economic theory of vicarious liability, [, discussed above,] because when the employee acts for solely personal reasons, the employer's ability to prevent the tort is limited.

*Papa Johns Intern. Inc. v. McCoy,* 244 S.W.3d 44, 52 (Ky.2008) (internal citations omitted).

■ Negligent hiring and retention claims differ, however, from liability based upon "respondeat superior." These claims require that an employer use reasonable care in the selection or retention of its employees. *Flor–Shin,* 964 S.W.2d at 442. Here, under "respondeat superior," the employer is strictly liable for the act, while under the theory of negligent hiring/retention, the employer's liability may only be predicated upon its own negligence in failing to exercise reasonable care in the selection or retention of its employees.

■ Thus, "[i]n any case in which [an employer] faces liability for the criminal actions of a third party, the focus [must necessarily be] on whether the criminal activity was foreseeable." *Ex parte South Baldwin Regional Medical Center,* 785 So.2d 368, 370 (Ala.2000). Thus, absent foreseeability, no duty, the breach of which entails liability, could arise.

In this regard, instruction No. 3, as given by the court, provided:

It was the duty of Ten Broeck Hospital to exercise that degree of care and skill ordinarily expected of reasonable and prudent hospitals acting under similar circumstances.

If you are satisfied from the evidence that the defendant failed to comply with that duty and that such failure on their part was a substantial factor in causing injury to Artemecia Brooks, you will find for the plaintiff, Artemecia Brooks, and proceed to Verdict Form A; otherwise proceed to Instruction No. 4.[18]

Ten Broeck Hospital's written personnel policy prohibited its employees from engaging in sexual activity with its patients. Thus, sex with its patients by Ten Broeck's employees, whether forcible or consensual, is necessarily outside the scope of their employment. Nor, can it be said to further Ten Broeck's interest. *See Cabrini Medical Center,* 719 N.Y.S.2d at 64 ("No amount of legal rhetoric can ... explain how a sexual assault furthers a hospital's business as a medical care provider.").

Analyzing Instruction No. 3 within the context of the evidence introduced at trial, one discerns that a jury may find Ten Broeck liable *solely* upon the occurrence of Gilbert's sexual conduct with Brooks. If intended to be applied in this context, the instruction violates the rule of an employers' liability enunciated in *Patterson* and *Papa Johns.* If, on the other hand, the breach of the duty imposed upon Ten Broeck under Instruction No. 3, is predicated upon the same factual foundation as Instruction No. 4, i.e., negligent hiring/retention, it is redundant.

■ Moreover, an ordinary care instruction is based solely upon negligence and "[t]here is properly speaking, no such thing as negligent assault." *City of Louisville v. Yeager,* 489 S.W.2d 819, 821 (Ky.

---

18. Instruction No. 4 is the negligent hiring/retention instruction previously discussed.

1973) (citing Prosser, Handbook of the Law of Torts, at 40, 41 (4th ed.1971)); see also State Farm Fire and Cas. Co. v. van Gorder, 235 Neb. 355, 455 N.W.2d 543, 545 (1990); Martin v. Yeoham, 419 S.W.2d 937, 945 (Mo.App.1967) ("Testimony tending to sustain the charge of negligence and carelessness would negative [sic] and disapprove willfulness or intentionality, and proof that the wrongdoing on the part of the defendant was deliberate would exclude negligence."). "An assault and battery is not negligence. The former is intentional; the latter is unintentional." Yeager, 489 S.W.2d at 822 (quoting Lamb v. Clark, 282 Ky. 167, 138 S.W.2d 350 (1940)).

> To instruct in such circumstances on a separate and distinct tort of negligence is not only doctrinally unsound but a potential source of jury confusion. It also raises the risk that even where no [intentional tort is committed], the jury will conclude that some undefined negligence was present for which relief of some sort is justified.

District of Columbia v. Chinn, 839 A.2d 701, 707, 708 (D.C.2003). "[A] plaintiff cannot seek to recover by 'dressing up the substance' of one claim, here assault, in the 'garments of another,' here negligence." Id. at 708. In fact, "[i]t is well settled that negligence and assault and battery claims are mutually exclusive." Pravda v. City of Albany, N.Y., 956 F.Supp. 174, 183 n. 9 (N.D.N.Y.1997) (citing United Nat. Ins. Co. v. Tunnel. Inc., 988 F.2d 351, 353 (2d Cir.1993)); see also Armoneit v. Ezell, 59 S.W.3d 628, 633 (Mo.App. E.D.2001) ("[P]roof of a willful act resulting in bodily harm ... will not justify or support jury submission of the case on a hypotheses that the injury for which recovery is sought was a result of an act of negligence.") As said before, "[n]egligence claims and assault and battery claims are mutually exclusive." 65 C.J.S. Negligence, § 12; but see District of Columbia v.

White, 442 A.2d 159, 163 (D.C.1982). "Since it is clear beyond question that [Gilbert's] act was beyond the scope of his employment and not in furtherance of [Ten Broeck's] interests, [it] can only be held responsible as master[ ] if it is established that they were negligent in selecting, employing or retaining him." Fleming v. Bronfin, 104 A.2d 407, 408 (D.C.App.1954) citing Ledington v. Williams, 257 Ky. 599, 78 S.W.2d 790 (1935).

▇▇▇ Consistent with the above, we pointed out in O'Roark v. Gergley, 497 S.W.2d 931 (Ky.1973), "the familiar principle that when an employe[sic] steps outside the scope of his duties and indulges in some act of a personal nature his employer will not be held responsible in the absence of reasonable forewarning." Instruction No. 3, as given by the trial court, does not guarantee this requirement. In fact, as previously mentioned, Ten Broeck could have been found liable under this instruction strictly upon Gilbert's conduct being a breach of its standard of care, which prohibited sexual relations with patients absent any forewarning to Ten Broeck of any such propensity. The Instruction was therefore erroneous, and should not be given at retrial.

▇▇▇ Under Kentucky law, the elements of negligent hiring and retention are: (1) the employer knew or reasonably should have known that an employee was unfit for the job for which he was employed, and (2) the employee's placement or retention at that job created an unreasonable risk of harm to the plaintiff. Flor–Shin, 964 S.W.2d at 442. Conversely, in Patterson, we noted:

> the doctrine of respondeat superior[ ] is not predicated upon a tortuous act of the employer but upon the imputation to the employer of a tortuous act of the employee by considerations of public policy and the necessity for holding a responsi-

ble person liable for the acts done by others in the prosecution of his business, as well as for placing on employers an incentive to hire only careful employees. *Ordinarily, an employer is not vicariously liable for an intentional tort of an employee not actuated by a purpose to serve the employer* but motivated, as here, solely by desire to satisfy the employees own sexual proclivities.

*Patterson,* 172 S.W.3d at 369 *citing American Gen. Life & Accident Inc. Co. v. Hall,* 74 S.W.3d 688, 692 (Ky.2002) (emphasis in original). The difference being, "respondeat superior" is based upon the employer/employee relationship and imposes strict liability, whereas claims of negligent hiring/retention focus on the direct negligence of the employer which permitted an otherwise avoidable circumstance to occur. For reasons that Instruction No. 3 violates this rule, it is erroneous.

### IV. The admissibility of Gilbert's arrest record

■ Ten Broeck also asserts error in the introduction of evidence of Gilbert's fourteen (14) misdemeanor arrests, none of which resulted in conviction.[19] Prior to trial, it filed a motion in limine to preclude the introduction of these arrests on grounds that such evidence was "irrelevant and unduly prejudicial." The trial court overruled the motion and permitted their introduction.

In support of the admissibility at trial, plaintiff's expert, Arthur Shorr, testified that arrests that did not result in conviction should have been reviewed by Ten Broeck's human resources department and should have been documented in making its decision to hire or retain him. Shorr conceded, nonetheless, that arrest records that do not result in a conviction, cannot be used to disqualify an applicant. Appellant now asserts error, in this regard, for

reasons that employers are barred from relying upon arrest records in making employment decisions when those arrests records do not lead to convictions, as it is widely acknowledged that the use of such records adversely impact African–Americans. *Green v. Missouri Pac. R. Co.,* 523 F.2d 1290 (8th Cir.1975); *Gregory v. Litton Systems, Inc.,* 472 F.2d 631 (9th Cir. 1972); *Tye v. Cincinnati,* 794 F.Supp. 824 (S.D.Ohio 1992). Gilbert is African–American.

■ Although the above argument was mentioned in Ten Broeck's Court of Appeal's brief, it was not addressed by the Court of Appeals. More importantly, this precise argument was never made in the trial court. An appellate court "is without authority to review issues not raised in or decided by the trial court." *Regional Jail Authority v. Tackett,* 770 S.W.2d 225, 228 (Ky.1989); *Matthews v. Ward,* 350 S.W.2d 500 (Ky.1961); *see also Lanham v. Commonwealth,* 171 S.W.3d 14, 21 (Ky.2005) (A motion in limine will be treated by an appellate court as not raising any matter for review not strictly within the scope of the motion.). Neither will the objections made in the motion in limine, that the evidence was "irrelevant and unduly prejudicial," be treated as supporting this new argument. This issue being unpreserved and not having been presented to the trial court in the first instance, we will not address it.

### V. Ten Broeck's Motions for Directed Verdict

#### A. Motion for Directed Verdict on the issue of negligent hiring/retention

Ten Broeck moved for directed verdict at the close of the evidence on the issue of its liability under Brooks' claim for negligent hiring/retention, arguing that the evi-

---

19. Gilbert had three (3) other misdemeanor convictions.

dence was insufficient to prove that Ten Broeck knew, or should have known, that Gilbert presented a threat of sexual assault to Ten Broeck's patients. The motion was denied by the trial court. Ten Broeck asserts the denial was error.

In reviewing a trial court's denial of a motion for directed verdict, all *"evidence which favors the prevailing party must be taken as true and the reviewing court is not at liberty to determine credibility or the weight which should be given to the evidence."* Humana of Kentucky, Inc., v. McKee, 834 S.W.2d 711, 718 (Ky. App.1992) (emphasis in original). Moreover, the *"prevailing party is entitled to all reasonable inferences which may be drawn* from the evidence." *Id.* (emphasis in original).

In *Flor–Shin,* the court held "the established law in this Commonwealth recognizes that an employer can be held liable when its failure to exercise ordinary care in hiring or retaining an employee creates a foreseeable risk of harm to a third person." 964 S.W.2d at 442. The test for liability is "[whether the employer] knew, or reasonably should have known, that (1) [the employee] was unfit for the job for which he was employed, and (2) whether his placement or retention in that job created an unreasonable risk of harm to [others]." *Id.*

As explained in *Pathways, Inc. v. Hammons,* 113 S.W.3d 85, 90 (Ky.2003):

Foreseeable risks are determined in part on what the defendant knew at the time of the alleged negligence. "The actor is required to recognize that his conduct involves a risk of causing an invasion of another's interest if a reasonable man would do so while exercising such attention, perception of the circumstances, memory, *knowledge of other pertinent matters,* intelligence, and judgment as a reasonable man would have."

*Id.* at 90 (*quoting* Restatement (Second) of Torts § 289(a)) (emphasis in original). Indeed, each case must be evaluated on the totality of its own circumstances consistent with this concept of foreseeability.

*Flor–Shin,* itself, cited to *Ponticas v. K.M.S. Investments,* 331 N.W.2d 907, 912–913 (Minn.1983), whose language is particularly appropriate here:

Although an employer will not be held liable for failure to discover information about the employees [dangerous unsuitability for the employment] that could not have been discovered by reasonable investigation, the issue is whether the employer did make a reasonable investigation. The scope of the investigation is directly related to the severity of risk third parties are subjected to by [the] employee. Although only slight care may suffice in the hiring of a yardman, a worker on a production line, or other types of employment where the employee would not constitute a high risk of injury to third persons, "a very different series of steps are justified if an employee is to be sent" after hours, to work for protracted periods in the apartment of a young woman tenant.

(*quoting Kendall v. Gore Properties,* 236 F.2d 673, 678 (C.A.D.C.1956)); *see also Kirlin v. Halverson,* 758 N.W.2d 436, 453 (S.D.2008) (considering the employee's minimal contacts with the public, the court held, the employer "was not under a duty to terminate [the employee's] employment because of this history, as a matter of a duty of reasonable care."); *Connes v. Molalla Transport System, Inc.,* 831 P.2d 1316, 1321 (Colo.1992) ("The scope of the employers' duty in exercising reasonable care in a hiring decision will depend largely on the anticipated degree of contact which the employee will have with other persons performing his or her employment duties."); *Garcia v. Duffy,* 492 So.2d 435,

441 (Fla.App.1986) ("[I]n analyzing the employer's responsibility to check out an applicant's background, it is necessary to consider the type of work to be done by the prospective employee"). *Williams v. Feather Sound, Inc.*, 386 So.2d 1238, 1240 (Fla.App.1980) ("If an employer wishes to give an employee the indicia of authority to enter into the living quarters of others, it has the responsibility of first making some inquiry with respect to whether it is safe to do so."); *C.K. Sec. Systems, Inc. v. Hartford Acc. & Indem. Co.*, 137 Ga.App. 159, 223 S.E.2d 453, 455 (1976) ("[C]ircumstances of the case may require a greater amount of care to meet the degree or standard of care required.") Whether or not the employer exercises such care is ordinarily a jury question. *Flor–Shin*, 964 S.W.2d at 442 ("Thus, the issue of Flor–Shin's liability is for a jury to decide."); *Ponticas*, 331 N.W.2d at 913 ("This is generally a jury question.").

■ Here, evidence favorable to Brooks, discloses that St. Matthews police detective, Brad Jeffery, testified that he received information about a sexual predator at Ten Broeck in December 2000, while investigating a patient-on-patient rape at Ten Broeck. The information was given to him by an employee of Ten Broeck. The detective reported the information to the attorney representing Ten Broeck on the matter of the alleged patient-on-patient rape the detective was then investigating.

Specifically, he told the attorney he had received a call about Gilbert working on the adolescent wing and that he had "perped" on a couple of females on the adolescent wing. Detective Jeffery defined "perping" as the act of a sexual predator to lure or prime a victim sexually

before the sexual predator attacks. The attorney called the detective back after about two-and-a-half hours and stated he had spoken to Sherrie Greenhill, Ten Broeck's human resources director and risk manager and that she had advised Jeffery that there was no one there by that name, nor did anyone fit the description or were they aware of any such problems. Detective Jeffery had passed on a description of Gilbert. According to Detective Jeffery, these conversations occurred in December 2000, prior to the alleged sexual assault of Brooks on the night of January 5, 2001.[20]

According to Anita DeBroy, Ten Broeck's charge nurse for the 11:00 p.m. to 7:00 a.m. shift, Gilbert would regularly make sexual comments and engage in inappropriate sexual conduct. She discussed the behavior and comments with co-workers and testified about the following patient complaints, which, according to her, where reported to Ten Broeck:

1. Gilbert entered patients rooms which was a violation of hospital policy;

2. Gilbert ran his hand up a patients' leg, asking the patient if she knew another patient and when she replied yes, Gilbert said "she's wild. Are you wild?"

3. Gilbert inappropriately obtained and read one of the children's personal diary;

4. Gilbert had an inappropriate sexual conversation with a lesbian patient.

In one instance, Gilbert told DeBroy that he liked to watch a particular female walk down the hall "to watch how her butt bounces."

---

**20.** That this conversation occurred prior to the alleged sexual assault on Brooks is disputed by Appellant. Nevertheless, we cannot, under the appropriate rules, resolve this factual dispute—we must assume the truth of

Brooks' evidence. *See Reece v. Nationwide Mutual Ins. Co.*, 217 S.W.3d 226, 231 (2007) (*citing Lovins v. Napier*, 814 S.W.2d 921 (Ky. 1991)).

Nancy Reed, a nurse and supervisor of mental health associates at Ten Broeck, was so concerned about Gilbert's conduct that she told co-workers to "watch out for him." According to her, the leg rubbing incident, was reported.

Sherrie Greenhill, risk manager and director of human resources and performance improvement at Ten Broeck, acknowledged in her testimony that she was aware of a discrepancy in Gilbert's employment application regarding his criminal convictions. Gilbert had three criminal convictions, but in his application, only listed one. She acknowledged that she did not inquire as to this discrepancy. She and Larry Koebel were responsible for hiring Gilbert. Yet, as risk manager, she testified that she made a conscious decision not to provide Gilbert's criminal background information to Koebel. She was aware of this discrepancy before Brooks became a patient. Moreover, she acknowledged that lying on an application for employment can be cause for immediate termination from the hospital.

Koebel described one specific incident reported to Ten Broeck in regards to Gilbert's rubbing a female patient's leg and acknowledged this was a "big deal" and should have been investigated by Ten Broeck; indeed, the hospital's protocol required an investigation. He also admitted that there was no reason for a male mental health associate, such as Gilbert, to enter a female patient's room alone.

John Bisig was a nurse manager/associate nurse executive for Ten Broeck. He acknowledged that he was advised by one of the staff nurses that two children had made allegations that Gilbert came into their room on the 11:00 p.m. to 7:00 a.m. shift and made statements that made them feel uncomfortable. Gilbert asked one girl whether she liked sex and asked the other girl whether she wanted to have a baby. The children were between the ages of 11

and 12. He acknowledged that these complaints were made before "any of this stuff regarding [Brooks] was known." No investigation or action was taken by Ten Broeck in response to this information.

■ "Negligent retention ... occurs when, during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further action such as investigating, discharge, or reassignment." Garcia, 492 So.2d at 438–39. And, where "the hospital had received actual notice of allegations that [the employee] had sexually assaulted patients ... it was not unforeseeable that [the employee] would continue to act in a consistent, if not worse, manner." Copithorne v. Framingham Union Hosp., 401 Mass. 860, 520 N.E.2d 139, 142–43 (1988).

Thus, viewing the evidence under the appropriate standard, the court did not err in denying the Appellant's motion for directed verdict on the issue of negligent hiring/retention.

## B. Motion for Directed Verdict on the punitive damages

Appellant also argues that the court erred in refusing to grant its motion for a directed verdict on Brooks' claim for punitive damages for reasons that the evidence did not establish same. Appellee, however, asserts, and we agree, that this issue was not presented in Ten Broeck's motion for discretionary review.

■ Arguments that punitive damages violate the policy of federal and state law banning employment discrimination and that punitive damages cannot be assessed under Patterson, 172 S.W.3d at 361, when an employee's conduct is outside the scope of his employment, and of no benefit to his employer, questions we have previously

addressed in sections III(B) and IV, do not present, or preserve, this issue as now argued by the Appellant. "[I]ssues not raised in the motion for Discretionary Review will not be addressed by this Court despite being briefed before us and addressed at oral argument." *Wells v. Commonwealth*, 206 S.W.3d 332, 335 (Ky.2006).

### Conclusion

We, therefore, affirm the Court of Appeals' opinion in regards to Issues II, IV, V(A) and V(B), but reverse the opinion of the Court of Appeals on issues I, III(A) and III(B) and vacate the judgment against Appellant and remand this matter back to the trial court for a new trial consistent with this opinion.

CUNNINGHAM and VENTERS, JJ., concur. NOBLE, J., concurs in Justice SCOTT'S excellent Opinion, but would emphasize that the testimony about incidents allegedly concerning sexually predatory acts by "Gilbert," addressed under Section II of the majority Opinion would have been impermissible hearsay if they had not been offered for a proper non-hearsay purpose: to establish knowledge on the part of Ten Broeck that such behavior could be occurring. SCHRODER, J., concurs in result only by separate opinion, with MINTON, C.J., joining that opinion. ABRAMSON, J., not sitting.

SCHRODER, Justice, Concurring in Result only.

I disagree with the majority's view that evidence of Brooks' sexual promiscuity, past sexual behavior and that she liked sex too much was relevant to the issue of damages. This presumes that a woman who is more sexually active and/or promiscuous will be less affected by being raped and suffer fewer damages. I believe this

type of evidence was what the Rape Shield Law was enacted to exclude.

MINTON, C.J.; joins this opinion.